# HAROLD LEROY SCOTT *v.* STATE
# OF MARYLAND

[No. 487, September Term, 1968.]

*Decided August 12, 1969.*

The cause was submitted to MURPHY, C.J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Robert V. Lazzaro* for appellant.

*Henry J. Frankel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert C. Stewart, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

This case presents questions as to the admissibility of evidence seized substantially contemporaneously with the arrest of the appellant in premises occupied by him.[1]

---

1. On appeal the appellant does not contest the validity of his arrest. At the trial it was established that he was arrested under the authority of a document issued by the Clerk of the Circuit Court for Anne Arundel County upon the appellant's indictment for possession of narcotics by the grand jury for that county. The document, admitted in evidence, read:

"To the Sheriff of Anne Arundel County, Greeting: YOU ARE HEREBY COMMANDED TO TAKE Harold L. Scott if he shall be found in your bailiwick and him safe keep so that you have his body before the Circuit Court for Anne Arundel County, to be held in the city of Annapolis immediately to answer unto State of Maryland for possession of narcotics. Hereof fail not at your peril, and have you then and there this writ.

Witness, the Honorable JAMES MACGILL, Chief Judge of the said Court, the 5th day of March, in the year

## THE LAW

The police have the right to conduct a contemporaneous search of the arrestee's person for weapons, fruits

of our Lord, one thousand nine hundred and 68. Issued 10th day of May 1968.

Marjorie S. Holt (signed)
..................................................................................................
Clerk of the Circuit Court for Anne Arundel County"

We think it clear that this document was a warrant for the arrest of the appellant. Md. Rule 706a provides in pertinent part:

"When an indictment or information has been filed, a warrant for the arrest of each defendant named therein shall be issued by the clerk."

And see *Ex Parte United States*, 287 U. S. 241. (We note that a warrant of arrest may also be issued by a justice of the peace. A Committee note to the rule states that it was not intended to affect the power of a justice of the peace to issue a warrant of arrest.) During the trial the document was variously referred to as an "arrest warrant," a "bench warrant" and a "capias." It was clearly process upon indictment—"The means by which an accused person is compelled to appear in court, as upon an arrest under a warrant. * * * A Warrant of arrest is included within the term 'process' and, to all practical intents and purposes, is the same as a capias." *Fisher, Laws of Arrest* (1967), §§ 5-6, pp. 10-11. See *Blackstone, Commentaries on the Law of England* (1st Ed.) Book IV, Ch. XXIV, entitled "Of Process Upon An Indictment," 318-319; 1 *Varon, Searches, Seizures and Immunities* (1961), Ch. III, § (a), pp. 114-115 and § (b), pp. 165-166. Fisher, § 6, pp. 10-12 gives the following definitions:

"*Warrant of arrest*. An arrest warrant is a written order or mandate issued by a magistrate or other legally authorized official, made in the name of the state, directed to a peace officer or some other specially designated person, commanding him to arrest and bring before the court the person named therein."

"*Bench warrant*. A bench warrant is a process issued by the court itself, or from the 'bench', for the arrest of a person to compel his attendance before the court. It is used in cases of contempt of court, to bring in a witness who has not obeyed his subpoena, or after an indictment has been found."

"*Capias*. The generic name for a variety of writs directing officers to take persons into custody. In a broad sense it includes any process having for its purpose the arrest or detention of a person, either in civil or criminal cases. For all practical purposes it is the same as a warrant of arrest. Literally the Latin term *capias* means 'that you take'."

It was shown by the testimony of the "Chief Criminal Clerk for Anne Arundel County" that the warrant (designated by him as a *capias*) had been issued when an indictment against the appellant was returned. Corporal Frank Massone, assigned to the Intelligence Unit of the Maryland State Police Department tes-

or instrumentalities of the crime, or "mere" evidence, incident to a lawful arrest. See *Terry v. State of Ohio*, 392 U. S. 1, 25. Such a search is reasonable in order to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape and to secure any evidence in order to prevent its concealment or destruction.[2] While this right to search the person of the arrestee was clearly established, the scope of a warrantless search beyond the person of the arrestee as incident to a lawful arrest was not. To say the least, the cases on the point decided by the Supreme Court do not lend themselves to easy summarization. In *Abel v. United States*, 362 U. S. 217 the Court acknowledged that "the several cases on this subject in this Court cannot be satisfactorily reconciled." However, it came to be considered that such a search may generally extend, as being reasonable, to the area that is considered in the "immediate possession" or under the "immediate control" of the person arrested.[3]

---

tified that he had received it from the Sheriff's Office in Annapolis, and that he, accompanied by Detective Earl Kratsch, Baltimore Police Department, C. I. D. Division, Narcotics Unit and other members of that Unit, served it on the appellant on 4 June 1968 at 1516 Ashland Avenue, Baltimore, Md., the address of the appellant. "The door was answered by Mr. Scott's mother. She let us in. I asked where Harold Leroy Scott was. She said that he was on the third floor. Detective Kratsch went upstairs. I followed him and found Mr. Scott in the bedroom in his underwear, and placed Mr. Scott under arrest, and read to him the capias or warrant." The appellant presents no question on appeal as to the execution of the warrant. But see Md. Rule 706b; Md. Code, Art. 75, § 85; Md. Rule 104. The trial court found that the arrest was valid. See *Williams v. State*, 6 Md. App. 511, 516-517.

2. By dictum in *Weeks v. United States*, 232 U. S. 383, 392 the Supreme Court indicated the right was "always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits of evidences of crime." In *Gross v. State*, 235 Md. 429, 440, the Court of Appeals said, "It needs no citation of authority to assert that when a person has been lawfully arrested, the police have a right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of, or implements used to commit the crime. The right was extended to "mere" evidence by *Warden, Maryland Penitentiary v. Hayden*, 387 U. S. 294.

3. See 47 Am. Jur., *Searches and Seizures Incident to Arrest*, § 19, pp. 75-78; 1 *Varon, Searches, Seizures and Immunities* (1961), pp. 191-193; *Search and Seizure Incident to Arrest*, 32

The test of reasonableness could not be stated in rigid and absolute terms, *Harris v. United States,* 331 U. S. 145, and must find resolution in the facts and circumstances of each case, *United States v. Rabinowitz,* 339 U. S. 56. The rule was simply stated but was difficult in its application to given circumstances for it could not be clearly defined, from an abstract point of view, depending as it did, on the interpretation of such phrases as "immediate presence," "immediate control" or "immediate surroundings" of the arrestee in the light of the facts of a particular case. But it seemed that a search incident to a valid arrest, otherwise reasonable, was not automatically rendered invalid by the fact that a dwelling place rather than business premises was subjected to search and that the right to search was not limited to the room in which the arrest took place. *Harris v. United States, supra.* In *Harris,* where a four room apartment was searched, it was observed that the area which reasonably may be subjected to search was not to be determined by the fortuitous circumstances that the arrest took place in the living room as contrasted to some other room of the apartment.[4] It appeared, however, that the bounds of reasonableness were overstepped when the premises searched were separated from the place where the arrest was made, as when the office of the accused was searched following his arrest at his home, *Silverthorne Lumber Co. v. United States,* 251 U. S. 385, or as when a home, several blocks from the house where the arrests were made, was searched, *Agnello v. United States,* 269 U. S. 20. The search could not be a "general" and "exploratory" one; it appeared that the validity of a search without a search warrant may be affected by

---

A.L.R. Anno., pp. 697-700, 51 A.L.R. Anno., pp. 434-439, 74 A.L.R. Anno., pp. 1395-1400, 84 A.L.R. Anno., pp. 786-789; Anno. 4 L.Ed.2d 1983. *Varon* states, at 190, that the search incident to an arrest "is extracurricular in the respect that since the search was not presumed to be contemplated at the time the arrest warrant was issued * * *, after service of the arrest warrant, any search made incidental thereto should be reasonable."

4. *Go-Bart Importing Co. v. United States,* 282 U. S. 344, was apparently in irreconcilable conflict with *Harris.*

the method of search, Anno: 4 L.Ed.2d 1983, 1988. And a search was held unreasonable when a great mass of property was seized (the seizure of the entire contents of a house being barred) *Kremen v. United States,* 353 U. S. 346; Anno: 4 L. Ed. 1983, 1990. But a search made without a search warrant, as an incident to a lawful arrest, was not illegal merely because there was time for the arresting officers to have procured a search warrant. *United States v. Rabinowitz, supra.*

Both the Court of Appeals and this Court have stated the rule to be that "the right to search and seize without a warrant (incident to a lawful arrest) extends to things under the accused's immediate control and to an extent depending upon the circumstances of the case, to the place where he is arrested." *Gross v. State,* 235 Md. 429, 440; *Huber v. State,* 2 Md. App. 245, 260. The decisions of this State have not established that the permissible scope of the search is necessarily confined to the room in which the arrest was made. For example, in *Huber* we found that although the arrest took place as the accused admitted the officers into his apartment, a search of the entire apartment was justified and evidence found in the bedroom was lawfully seized under the circumstances there existent. And in *Davis v. State,* 236 Md. 389 the officers conducted a search of the house following the arrest, and in a hamper in the bathroom, located next to the room in which the accused was arrested, took certain clothing. The Court held that "this search was within the limits of the areas within the control of the arrestee and justified the seizure of the evidence." At 397. A hatchet admitted in evidence was found in a tool box located on the side of the house, close to the point where the victim of the homicide for which the arrestee was convicted was found. The Court said, at 397, "Since the perpetrator of this crime used the curtilage of the house, as well as the interior thereof, for his illegal activity, we find that this search was justified as incidental to the arrest of the accused", citing *Gault*

*v. State,* 231 Md. 78; *Rucker v. State,* 196 Md. 334. See also *Matthews v. State,* 228 Md. 401.

On this state of the law the Supreme Court decided *Chimel v. State of California,* 395 U. S. 752, 89 Sup. Ct. 2034, 23 L.Ed.2d 685 (1969). *Chimel* makes abundantly clear that the general principle is that a search and seizure is to be made under the authority of a search warrant based on probable cause.[5] "Clearly, the general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it * * *'," citing *United States v. Jeffers,* 342 U. S. 48, 51. The Court pointed out that in *Terry v. Ohio,* 392 U. S. 1, it emphasized that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," *id.,* at 20, and that "[t]he scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.,* at 19. Thus, the basic criterion is that the search be reasonable. What is reasonable depends upon "the facts and circumstances— the total atmosphere of the case," citing *United States v. Rabinowitz, supra* at 66, but "those facts and circumstances must be viewed in the light of established Fourth Amendment principles." When a person is lawfully arrested, there is a need to prevent the officer's safety from being endangered and the arrest itself frustrated. Therefore, a search of the arrestee's person, substantially contemporaneous with the arrest, in order to remove any weapons, is reasonable. "In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent

5. The Court noted, note 9:
"Our holding today is of course entirely consistent with the recognized principle that, assuming the existence of probable cause, automobiles and other vehicles may be searched without warrants 'where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' *Carroll v. United States,* 267 U. S. 132, 153; see *Brinegar v. United States,* 338 U. S. 160."

its concealment or destruction." And, the Court said, the area within the arrestee's "immediate control," must, of course, be governed by a like rule. *Chimel* then defined the area which may be considered within the arrestee's "immediate control." It construed that area to mean "the area from within which he might gain possession of a weapon or destructible evidence." It spoke of such area also as that into which he *"might* reach in order to grab a weapon or evidentiary items. A gun on a table or in a drawer *in front of one* who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." (Emphasis supplied.) And it said later in the opinion :

> "No consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items. The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other."

The Court left no doubt that routinely searching rooms other than that in which an arrest occurs is not reasonable. Nor is there justification "for searching through all the desk drawers or other closed or concealed areas" even in the room in which the arrest occurs. "Such searches, in the absence of well recognized exceptions, may be made only under the authority of a search warrant. (Citing *Katz v. United States,* 389 U. S. 347, 357-358.) The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." So the permissible scope of the search is limited to the arrestee's person and the area within his immediate control, stated to mean the area from "within which (the arrestee) might gain possession of a weapon or destructible evidence." Such area is not further defined other than by referring to it as "the area within his reach" and the area into which he

"might reach in order to grab a weapon or evidentiary items" and by remarking that a "gun on a table or in a drawer *in front of* one who is arrested" can be dangerous to the arresting officer. (Emphasis supplied.) But as the search is tested by its reasonableness and its scope is justified by the need to protect the arresting officer and to prevent the destruction of evidence, we cannot construe *Chimel* to mean that the area is confined to that precise spot which is at arm length from the arrestee at the moment of his arrest. He may well lunge forward or move backward or to the side and thus into an area in which he *might* grab a weapon or evidentiary items then within his reach before the officer could, by the exercise of reasonable diligence, restrain him. We think that *Chimel* requires that the State show that the search was conducted and items were seized in an area "within the reach" of the arrestee in this concept, as for example, by evidence as to the location of the items with respect to the whereabouts of the arrestee, the accessibility of the items and their nature.[6]

It was not determined in *Chimel* whether the principles therein endorsed would be retroactively applied. But, as will hereinafter be apparent, we are faced with the question and must resolve it, looking for guidance in the rationale of other opinions of the Supreme Court dealing with the retroactivity of the various rules from time to time enunciated. First, however, we are led to believe by two per curiam opinions decided the same day as *Chimel* that the Court had in mind at the most something less than full retroactivity. In *Von Cleef v. New Jersey,* 395 U. S. 814, 89 S. Ct. 2051, 23 L.Ed.2d 728 (1969), the petitioners' attacked the lower court's conclusion that a search and seizure were constitutionally permissible as being incident to a valid arrest. The Court said: "This challenge would unquestionably be well

---

6. It would seem that a seizure of a weapon or destructible evidence in a locked drawer in the immediate presence of the arrestee in the literal sense would be beyond the permissible scope of a search. 

founded if today's decision in *Chimel v. California, ante,* p. 752, were given retroactive application. But we need not decide here whether *Chimel* should be applied retroactively. For even under the constitutional standards prevailing before *Chimel,* see *United States v. Rabinowitz,* 339 U. S. 56; *Harris v. United States,* 331 U. S. 145, the search and seizure involved here were constitutionally invalid." In *Shipley v. California,* 395 U. S. 818, 89 S. Ct. 2053, 23 L.Ed.2d 732 (1969), the Court said: "Under our decision today in *Chimel v. California,* 395 U. S. 752, the search clearly exceeded Fourth Amendment limitations on searches and seizures incident to arrest. But even if *Chimel* were to have no retroactive application—a question which we reserve for a case which requires its resolution — there is no precedent of this Court that justifies the search in this case." Hopefully, we think it logical that had the Court felt that *Chimel* must have full retroactive application it would have so indicated in those opinions and resolved the matter. We also find support for our belief that *Chimel* should not have full retroactive application in *Desist v. United States,* 89 S. Ct. 1030. In the face of a claim that *Katz v. United States,* 389 U. S. 347 did not present a choice between prospective and retroactive application of new constitutional doctrine because the Court in that decision did not depart from any existing interpretations of the Constitution, but merely confirmed the previous demise of obsolete decisions enunciating the distinction between "trespassory" searches and those in which there was no physical penetration of the protected premises, the Court said *Katz* recognized that the holdings in *Goldman v. United States,* 316 U. S. 129 and *Olmstead v. United States,* 277 U. S. 438 had not been overruled until that day. "However clearly our holding in *Katz* may have been foreshadowed, it was a clear break with the past, and we are thus compelled to decide whether its application should be limited to the future." 89 S. Ct. 1033. We think that *Chimel* recognized that its rulings were a clear break with the past. In concluding that a warrantless search

of an arrestee's entire house cannot be constitutionally justified as incident to his arrest the Court observed that its decisions "bearing upon that question have been far from consistent, as even the most cursory review makes evident." It stated that *United States v. Rabinowitz, supra,* "has come to stand for the proposition, *inter alia,* that a warrantless search 'incident to a lawful arrest' may generally extend to the area that is considered to be in 'possession' or under the 'control' of the person arrested," but it noted, note 4, that its decisions since *Rabinowitz* "have applied the abstract doctrine of that case to various factual situations with divergent results." It traced the history of the rule as from time to time enunciated, remarking on the lack of authority or weaknesses in the decisions relied upon in such enunciations and noting the swinging of the pendulum back and forth. It observed that *Marron v. United States,* 275 U. S. 192, holding that as incident to a lawful arrest, there was a right contemporaneously to search the place where an arrest occurs, was founded on the dictum of *Agnello v. United States, supra,* which had expanded, without explanation, on a principle in *Carroll v. United States,* 267 U. S. 132, which had embellished a statement made as dictum in *Weeks v. United States,* 232 U. S. 383, which statement made no reference to any right to search the *place* where an arrest occurs but was limited to a right to search the "person." It said that *Go-Bart Importing Co. v. United States,* 282 U. S. 344, and *United States v. Lefkowitz,* 285 U. S. 452, made evident that *Marron* did not mean all that it seemed to say but that the limiting views expressed in *Go-Bart* and *Lefkowitz* "were thrown to the winds" in *Harris v. United States, supra,* where thorough search of an entire apartment and the seizure of a sealed envelope marked "George Harris, personal papers" containing documents used to secure conviction, found inside a desk drawer, were found to be reasonable as "incident to arrest." A year later in *Trupiano v. United States,* 334 U. S. 699, although the arrest was found to have been valid, the search was found to be un-

lawful because of the unexplained failure of the authorities to procure a search warrant when they had enough time before the search to do so. Two years after *Trupiano, Rabinowitz* rejected the rule that "in seizing goods and articles, law enforcement agents must secure and use search warrants wherever reasonably practicable", the Court stating that the test "is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." 339 U. S. at 66. The Court felt that what *Rabinowitz* has come to stand for, at least in the broad sense, "can stand neither historical nor rational analysis." It held that *Rabinowitz* and *Harris*, "on their own facts, and insofar as the principles they stand for are inconsistent with those we have endorsed today, * * * are no longer to be followed." We think that the principles in *Rabinowitz* and *Harris* which were inconsistent with those endorsed in *Chimel* were not overruled until the *Chimel* decision. Even though they had been relied upon less and less in the Court's decisions, the time had not come to announce that they were no longer to be followed until the *Chimel* decision.[7]

It was established in *Linkletter v. Walker*, 381 U. S. 618, 629 that "the Constitution neither prohibits nor requires retrospective effect" for decisions expounding new constitutional rules affecting criminal trials. Thereafter, said the Court in *Desist*, it viewed the retroactivity or nonretroactivity of such decisions as a function of three considerations. 89 S. Ct. 1033. These considerations were summarized in *Stovall v. Denno*, 388 U. S. 293, 297.

> "[T]he criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the admin-

---

7. The Court said in *Chimel:* "It is time, for the reasons we have stated, to hold that on their own facts, and insofar as the principles they stand for are inconsistent with those we have endorsed today, they are no longer to be followed."

istration of justice of a retroactive application of the new standards."

*Desist* held that *Katz* is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance conducted after 18 December 1967, the date of the *Katz* decision. We think that *Desist*, in its consideration of the criteria guiding resolution of the question reaching its holding, is directly apposite to the consideration of the question here before us. The Court said, 89 S. Ct. 1033-1034:

> "[the first] criterion strongly supports prospectivity for a decision amplifying the evidentiary exclusionary rule. Thus, it was principally the Court's assessment of the purpose of *Mapp v. Ohio* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081, which led it in *Linkletter* to deny those finally convicted the benefit of Mapp's extension of the exclusionary rule to the States:
>
> 'All of the cases * * * requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action. * * * We cannot say that this purpose would be advanced by making the rule retrospective. The misconduct of the police * * * has already occurred and will not be corrected by releasing the prisoners involved.' 381 U. S., at 637, 85 S. Ct. at 1741.
>
> We further observed that, in contrast with decisions which had been accorded retroactive effect, 'there is no likelihood of unreliability or coercion present in a search-and-seizure case'; the exclusionary rule is but a 'procedural weapon that has no bearing on guilt,' and 'the fairness of the trial is not under attack.' 381 U. S., at 638-639, 85 S. Ct. at 1742."

And in *Fuller v. Alaska,* 393 U. S. 80, it was held that the exclusionary rule of *Lee v. Florida,* 392 U. S. 378, should be accorded only prospective application. The sec-

ond and third criteria which the Court found in *Desist* to militate in favor of applying *Katz* prospectively, also militate in favor of applying *Chimel* prospectively. The area to be searched incident to an arrest had been widely construed in reliance on *Harris* and *Rabinowitz* as not confined to the room in which the arrest took place and certainly not to a restricted area within that room. As the Court itself recognized in *Chimel,* even its own decisions applied the doctrine of *Rabinowitz* to various factual situations with divergent results and some courts carried the *Rabinowitz* approach to such length as to permit a search of a man's house when he was arrested nearby. *Chimel,* note 10. The Court said in *Chimel,* "It is not easy to explain why, for instance, it is less subjectively 'reasonable' to search a man's house when he is arrested on his front lawn—or just down the street — than it is when he happens to be in the house at the time of arrest." As to the third criterion the Court in *Desist* found no cause to doubt that the number of state convictions obtained in reliance on pre-*Katz* decisions are substantial, at 1034-1035. We think that the number of convictions in this State obtained in reliance on pre-*Chimel* decisions are substantial although we note that the Court said that "because the deterrent purpose of *Katz* overwhelmingly supports nonretroactivity, we would reach the same result even if relatively few convictions would be set aside by its retroactive application." At 1035. In *Chimel* as in *Katz,* both the deterrent purpose of the exclusionary rule and the reliance of law enforcement officers focus upon the time of the search, not any subsequent point in the prosecution, as the relevant date. Exclusion of evidence seized before *Chimel* would increase the burden on the administration of justice, would overturn convictions based on fair reliance upon pre-*Chimel* decisions, and would not serve to deter similar searches and seizures in the future. See 89 S. Ct. 1036.

We hold that *Chimel* is to be applied only to cases in which the prosecution seeks to introduce the fruits of a search conducted after 23 June 1969.

*THE APPLICATION OF THE LAW TO THE FACTS*

The appellant was found guilty generally in a court trial in the Criminal Court of Baltimore under an indictment charging possession of heroin (1st count) and control of heroin (2nd count). He was sentenced generally to imprisonment for a term of 5 years. At the trial he challenged the admissibility of the evidence offered against him. The challenged evidence consisted of a red capsule, State's exhibit No. 2; 35 "clear gelatin capsules of white powder," State's exhibit No. 3; "a teaspoon with traces on same," "three and a half gelatin capsules with traces inside of them," "one clear plastic bag which had traces and pieces of foil," all contained in a brown paper bag in which there was also another bag "from Heneson's Pharmacy" containing 250 clear gelatin capsules, State's exhibit No. 4 as an entirety; and 50 "clear capsules of white powder," State's exhibit No. 10. Reports of the "United State's Chemist" established that the red capsule, exhibit No. 2 and the 35 clear gelatin capsules, exhibit No. 3, and the 50 capsules, exhibit No. 10, were filled with heroin hydrochloride; and as to exhibit No. 4, the clear plastic bag and the three and a half capsules contained traces of heroin hydrochloride—no prohibited drugs were detected on the teaspoon or the tin foil or in the 235 clear capsules. This evidence was obtained by searches falling into two categories, (1) by a search of the room in which the appellant was arrested, and, (2) by a search elsewhere on the premises. We deem both searches to have been substantially contemporaneous to a valid arrest. As they were conducted on 4 June 1968, *Chimel* is not applicable.

### (1)

The police were admitted to the premises 1516 Ashland Avenue, stated to be the address of the appellant, and upon receiving information that the appellant, for whom they had a warrant of arrest (see note 1 herein), was on the third floor proceeded up the steps. Kratsch observed the appellant "at the doorway of the third floor

front bedroom. He went back in the room. I followed him back in. At that time, he was advised and shown this warrant from Anne Arundel County * * *. A search incidental to the arrest was made * * *." Kratsch said it was the appellant's bedroom.[8] Exhibit No. 2 was found in a "tan waist length jacket, which was the property of Harold Scott, which was laying on the bed" in the room in which the appellant was arrested. The articles admitted as exhibit No. 3 were found "in the left coat pocket" of a black topcoat in the same room "on the rear of his bedroom door as the door swings into the bedroom. It would be on the door, between the door and the wall on the side bedroom." The items composing exhibit No. 4 were found on a metal clothes closet in the room. "As you would be coming into the room, the door swings in against the wall, right where the edge of this door was the metal clothes closet. * * * Right inside the bedroom door on the right-hand side, like when the door swings in against the wall, the metal closet is right there.

8. Massone informed the appellant of his rights by reading from a "Miranda card." The warnings given were read into the record. The appellant indicated he understood but was asked no questions. Massone testified he followed Kratsch upstairs and "found Mr. Scott in his bedroom in his underwear, and placed Mr. Scott under arrest, and read to him the capias or warrant. Then Detective Kratsch found certain items."

The appellant's mother, Mrs. Felice Scott, testified on the matter of the admissibility of the evidence. She said that when the police arrived and knocked on the door she looked out a window on the second floor. "I asked, 'Who was it?' They said, 'Police Officers.' I said, 'For what?' They said, 'For Harold Scott." I said, 'What do you want? What do you want him for?' They said, 'Concerning a car down in Annapolis, Maryland.' They had asked, 'Was he home?' I said, 'Yes', and they told me to come down and open the door, I came down. I called my son at first, and I told him the police were downstairs and wanted to see him. He said, 'For what?' I said, 'I don't know." She went downstairs and opened the door. "They rushed in. One, this big one, I never forget. He shoved me down to the chair in the living room and all of them ran upstairs." She ran upstairs behind them. "My son was getting out of bed. He had one leg trying to put his pants on, one leg in his pants and one of the officers ran to him and patted him down, like that (indicating). * * * There's a lot of clothes in this room. It's three beds in that one room. Three different people sleep in that room." There were clothes in the room belonging to the appellant, to another son, to her daughter and to her two brothers "who died last year."

\* \* \* On top of this clothes closet on the outside 'was the brown paper bag.' The metal clothes closet was about six feet high. The bedroom contained 'a twin-sized bed on the left and like a single bed on the right.' " There were other clothes on the bed with the tan jacket. Evidence admitted as exhibits 2, 3 and 4 were seized by Detective Kratsch.

The court held that the arrest of the appellant was valid and that the searches of the appellant, his clothing and the bedroom in which he was arrested were lawful as incident to the arrest.

We believe that the search of the appellant's room, contemporaneous with his valid arrest, and the seizure of the evidence thus obtained were reasonable as within his "immediate control" as that phrase has been construed prior to *Chimel*.[9] However, aware that neither the State in presenting its case, nor the lower court in making its factual findings and rulings had the benefit of the *Chimel* opinion, we cannot say that the evidence was sufficient to support a finding that the search conducted and the items seized were within the "immediate control" of the appellant as we have found that phrase to be construed in *Chimel*. Although it was shown where the items were found, their locations in relation to the appellant were not established, and, while they may well have been within an area into which the appellant might have reached in order to grab them, we cannot so conclude on the record before us. We note that there were no factual findings as to that matter by the lower court and we are not a fact finding body. It was for this reason that we made a determination of the retroactivity of *Chimel*.

As the search was reasonable under the pre-*Chimel* rules and as *Chimel* is not applicable, the evidence seized was properly admissible.

(2)

After the appellant's arrest Corporal Massone went

---

9. It is patent that the items seized were "destructible evidence."

downstairs. He informed the appellant's mother "of what was going on," gave her the *Miranda* warnings, "just as a matter of courtesy," informed her "that she was not under arrest and not in custody. However, her son was. I desired to search the premises for any contraband, that is narcotics. She said I could search anywhere. As a result of that conversation, I did search." On cross-examination on the issue of the legality of the search, Massone said, "We had searched the upstairs incidental to the arrest. As far as the downstairs was concerned, I desired to get the consent of Mrs. Scott * * * I would have made a reasonable search incident to the arrest anyway." He was asked, "So that you didn't need Mrs. Scott's consent?" and replied, "That's right." He further stated "I made a reasonable search with the consent. I would have made a reasonable search without consent. * * * I might not have gone into certain pocketbooks (without the consent)." He found a small manila envelope in which were 50 clear gelatin capsules containing a white powder, exhibit No. 10, in a pocketbook which he later ascertained belonged to the appellant's sister, Melinda Scott, who was not present at the time. The testimony of the appellant's mother was that one of the officers went downstairs and she followed him. Another officer was there and "they were whispering to each other. Then they started to go over to the buffet looking in pocketbooks and looking in the china." She was asked if the officers asked if they could search. She said, "As I got ready to tell him that the house was not my house, it's my mother's, I'm not the proprietor. He said, 'If you don't let me search, I'm going to search anyhow.' That's what he said. * * * I just stayed there and looked at them. I didn't say anything. They kept on searching."

It was at this stage of the trial that the court first ruled on the admissibility of the challenged evidence. The ruling clearly went only to the search of the appellant's clothing and his room, the court saying, "I * * * will limit the decision and ruling to the search of the defendant's own room and his clothing. It seems to me, that

on the whole of the evidence, the arrest was valid. The arrest being valid, the search was valid of the defendant's clothing and his room, and I so rule." The court remarked:

> "The question of search of the remainder of the house is not important really, and it isn't important for me to determine whether or not Mrs. Scott told them, 'Go ahead and search', because the officer testified he would have searched anyway. I do hold that she voluntarily consented to their searching the remainder of the house. The evidence that was found was apparently located in the purse of the defendant's sister, and I have excluded the proffer of the State of the evidence at the hearing that the defendant said it was not his sister's but his. That plays no part in the ruling, and I am excluding it from consideration of the evidence of the remainder of the narcotics found in the house, * * *."

The proffer referred to by the court was brought out during the testimony of Massone on the merits of the case. Both the direct and cross-examination of the witness on the matter of the search and seizure had been completed and the defense indicated it desired to call the appellant's mother on the issue. The court said, "Why not let him finish his testimony?" and direct examination was resumed by the State. It was elicited that Massone ascertained that the pocketbook in which he found narcotics belonged to the appellant's sister. As a result she was arrested and charged. At a preliminary hearing the charges against her were dismissed and the appellant charged with possession of narcotics found in the pocketbook "because of certain statements that were made (by the appellant) to the Magistrate at the preliminary hearing examination." Objection was made and sustained, the court saying, "I think that since he was not repre-

sented by counsel at the hearing, that this evidence should be excluded." After the State rested its case in chief the appellant testified in his own behalf. He said the tan jacket was on the bed by the door, which was not the bed in which he had been sleeping and that the jacket belonged to his oldest brother. There were "a lot of sweat shirts and a couple more jackets there." The black coat belonged to his uncle. He had no knowledge that there was any kind of drug or narcotic in the room and none of the narcotics were his. His uncle, before he died, slept in the room, and his two brothers and sometimes his sister slept there. On cross-examination he said that the brother who owned the tan jacket "stays on Monfred Avenue" where he had been living for about six months. He was asked to whom the pills found in his sister's pocketbook belonged. He said, "I don't know. I didn't know she had anything. I didn't know about the pills or anything else." Objection was made to the question. "Did you ever tell anybody that they belonged to you?" The court said: "I'll have to change my ruling now, because he just said that he didn't know who they belonged to, and I feel that the State can now follow that up." The State attempted to ascertain if the appellant had said at a preliminary hearing that the pills belonged to him and not to his sister. On objection the court ruled that the appellant could not be forced to testify "as to what he stated at the hearing in the absence of any evidence that he had counsel, or that he was fully advised of his Constitutional Rights. He says he was not and that is where we stand at this time." Detective Kratsch was called by the State in rebuttal and by his testimony, over objection, it was brought out that the appellant's sister had also been charged and at the preliminary hearing when the charges against her were read the appellant blurted out that she should not be charged because "the stuff was his." "He burst right out with this. The Judge then advised him of his rights further, and first he told him that he didn't want him to testify, and that it was just a preliminary hearing. So then, after, he burst this out,

then the Judge advised him of his rights and that this could be used against him downtown in a Court of law. He then stated, 'It's still my stuff.'" Defense counsel moved to strike all the testimony and the motion was denied for the reason, as stated by the court, that it was admissible to impeach the credibility of the appellant as a witness. The court said that the basis of its prior ruling that the statement by the appellant was not admissible "* * * was that there was no evidence before the Court at that time that the defendant had counsel or that he had been advised of his rights. The defendant then took the stand and in answer to the question, he said that he had never been advised of his rights. It seems to me, that we open the question bearing upon the truthfulness of the defendant. It is for that reason that I have to allow the evidence to come in, that he was advised of his rights after, as Detective Kratsch has testified, he burst out with the statement, and not in answer to any question asked him. But he burst out with the statement, that this stuff was his and not his sister's. * * * This was no interrogation, this was a voluntary statement that he made." After the ruling, on cross-examination of Kratsch, it appeared that the preliminary hearing on 5 June 1968 was a joint one of the appellant and his sister. "The Judge was going to swear us in. He told him to keep his hand down and that he wasn't going to take any plea because he wasn't represented by counsel, and was going to be sent downtown anyway, if we had enough evidence. At that time the charges were read out, and he stated that the drugs were all his and not his sister's or words to that effect. The Judge then came back and stated that he didn't want him to say anything because what he would say could be used against him, and advised him of his rights. He stated, 'It's okay. It's still not my sister's. It's all mine.'" The hearing was postponed until 12 June. Before another judge the charge against the sister was dismissed. Defense counsel asked the witness, "The reason for that * * * is that Judge McGuire ruled on the search and seizure of the sister's pocketbook, and that

it was illegal, didn't he?" The witness replied, "I believe something to that effect, yes. * * * I remember the Judge saying something about the search and seizure and the purse downstairs was illegal, but the Judge was informed of what he stated." Defense counsel again moved to strike the testimony as to the statement of the appellant at the preliminary hearing and the motion was denied. Defense counsel requested an opportunity to obtain the testimony of the judge who presided at the preliminary hearing of 5 June. The State countered by suggesting that the court receive the statement only as going to the credibility of the appellant and to exclude from consideration the narcotics found in the pocketbook. The appellant would not agree to this, arguing that the statement was not admissible in any event. The trial was continued. When it resumed on a later date defense counsel informed the court that he had talked to the judge who presided at the preliminary hearing on 5 June but that he was sick and not then available to appear as a witness. He recounted the conversation:

> "I explained to Judge Broccolino that this person had been before him on a preliminary hearing, refreshed his recollection as to the date and municipal court where he was sitting at that time, and asked him specifically if he recalled whether or not he had advised the defendant Scott of any of his rights when he appeared before him on a preliminary hearing. It was also brought to Judge Broccolino's attention, and he seemed to recall specifically, that Scott had requested a postponement of the case so that he could engage an attorney. I informed him that that was correct, that that is exactly what had happened, the case was not actually heard until the following week. He then stated to me that he does not at any time ever advise any defendants, who appear for preliminary hearing only, of any of their rights; that he

does not take pleas from persons who are before him on preliminary hearings who do not have attorneys; and that he does not permit them to say anything during the course of the hearing, realizing that that would all be done at the time the defendant is brought into the court following his indictment.

I then asked him if he specifically recalled, on the date that Scott was before him, a situation wherein Scott blurted out unsolicited a statement that certain narcotic evidence that had been seized was his property, and not that of his sister, who was a co-defendant also charged in the same case; and that she should in effect be released. This allegedly was followed by a statement from Judge Broccolino advising the defendant of his rights under the Miranda decision, followed by Scott's insistence on blurting out this alleged confession or incriminating statement.

Judge Broccolino informed me that he had no recollection of any such incident as that. Beyond that nothing else that he said would be pertinent here, but I would offer that. * * *

His feeling was that it did not happen because he felt he would have remembered something like that; he had no recollection of ever advising any one of any rights, under the Miranda case, for the purpose of making a statement admissible in court, that his statement to me was in our conversation, at that point he would have really been interested in that, and that at the most he would ever say to a defendant under those circumstances would be simply not to say anything at that point. But, he did have no specific recollection of any such statement having been made such as that."

The State said that it would only stipulate "that were

Judge Broccolino here he would testify that he does not routinely advise the defendants of their rights and he, in this preliminary hearing situation, and that he does not have a recollection of anyone blurting out anything." (sic). The record does not disclose that an agreement was reached on the stipulation.

After argument the court rendered its verdict. In so doing it ruled that the arrest of the appellant was legal as under the authority of a warrant of arrest; that the search of the appellant and his clothing and his bedroom was reasonable as incidental to a legal arrest; that the search of the first floor was a reasonable search because it was voluntary and authorized by the appellant's mother who was the apparent owner of the premises; that, although it first held that the statement of the appellant at the preliminary hearing was inadmissible, it subsequently allowed "the State to impeach the testimony of the defendant by proving that at the first preliminary hearing that the defendant in an obvious effort to exculpate his sister blurted out in a purely voluntary basis, when he was not being held in custodial interrogation, the statement that the articles found in the hand purse or hand pocketbook of his sister were not his sister's but were the property of the defendant." It made a specific ruling: "I rule that legally that the evidence as to his voluntary statement made in the Municipal Court at the first hearing was admissible in evidence." It commented:

"Practically, of course, it is part of a rather insincere effort to, and cozy arrangement according to the defendant, to do this, that he can exculpate members of their family in the lower court, and then come into this court and scream that that has to be kept out of evidence even though it was voluntary at the time.

It is a picture of untruthfulness and insincerity to put it in the most charitable form. And until some other court says that the dishonesty of the defendant cannot be proved I am not going to rule that way."

It held: "Under all of the evidence I find that, and for the reason which I have outlined, I find the defendant guilty under both counts of the indictment."

On this state of the record the appellant presents only one question which he makes in the form of a contention: "The search of the appellant's room along with the whole home was illegal absent a valid search warrant." The answer to this precise contention is, as herein before stated, that a search made without a search warrant, as an incident to a lawful arrest, was, prior to *Chimel,* not illegal merely because there was time for the arresting officers to have procured a search warrant. And we have found that the search of the room was reasonable as a search of the "immediate surroundings" as that phrase was construed prior to *Chimel.* In his argument under the contention the appellant claims that the police used the arrest warrant as a pretext to search the house. But we said in *Williams v. State,* 6 Md. App. 511, at 519: "Where one motive is to make a bona fide arrest, a duality of motive will not, of itself, make the subsequent search unreasonable nor will it transform the arrest into a pretext," citing *Sedacca v. State,* 252 Md. 207 and *Musgrove v. State,* 1 Md. App. 540. He also claims that the evidence was not sufficient to establish that the narcotics found in the bedroom were in his possession and control. We do not agree. We think that the evidence as to the narcotics found in the bedroom, which we have found to be admissible, either directly or by rational inferences therefrom, was sufficient for the trier of fact to find, beyond a reasonable doubt, that the appellant had actual possession, or at the least, constructive possession of them, and control of them, as those terms are construed. See *Haley, et al v. State,* 7 Md. App. 18, 32-33; *Williams v. State,* 5 Md. App. 450. Thus, on that evidence, the judgment of the lower court was not clearly erroneous. Md. Rule 1086. The appellant further claims that "[w]ith or without permission, the search of the downstairs was illegal." But, apparently on the assumption, as stated in his brief, that the lower court

ruled that the narcotics found in the pocketbook were inadmissible, he does not argue that this evidence did not establish that he possessed or controlled the narcotics so seized, merely stating that the court "still heard the testimony and must have been prejudiced against (him) because of it." We can only construe the court's rulings, as explained by it, to have been that ultimately it admitted the narcotics found in the pocketbook as the result of a permissive search. Further, we can only conclude from the record that the court admitted the statement made by the appellant at the preliminary hearing, but only as going to the credibility of the appellant and not as to the fact that the narcotics found in the pocketbook were his. These rulings leave the case in an unusual posture. Although, as we have found, the evidence as to the narcotics found in the bedroom was sufficient to support the charges as made, the evidence as to the narcotics found in the pocketbook was not. The latter evidence, by the court's rulings, was only that heroin was found in a pocketbook belonging to the sister, which pocketbook was situated on the first floor of premises occupied by the sister as well as the appellant. We cannot say, even assuming that the narcotics seized from the pocketbook were properly admissible, that this established that those narcotics were in the appellant's possession and control. See *Haley, et al v. State, supra, Wimberly v. State,* 6 Md. App. 302. The question is whether the admission of the narcotics found in the pocketbook was error requiring reversal of the judgments in the circumstances. We believe not. We reach this conclusion regardless of our finding that the evidence as to the narcotics found in the pocketbook did not prove the appellant's possession and control of them and regardless of whether or not they were properly admitted.[10] We rely

10. Therefore, we do not reach the question of the standing of the appellant to object to the search of the pocketbook. But, see *Curreri v. State,* 199 Md. 54, in which bet slips were obtained by the search of a truck. The defendant claimed no interest in the truck but he said that the slips were his and that he put them in the truck himself. The Court held that he could not object to

on the rationale of *Harrington v. California*, 89 S. Ct. 1726, in which the opinion of the Court stated that the evidence was so overwhelming in that case that a violation of *Bruton v. United States*, 391 U. S. 123 was harmless beyond a reasonable doubt "unless we adopt the minority view in *Chapman* [11] that a departure from constitutional procedures should result in an automatic reversal, no matter the weight of the evidence." At 1728. As in *Harrington* the case here was not woven from circumstantial evidence. The evidence as to the narcotics found in the bedroom alone was sufficient to support the convictions. While it might have been better for the trial court to have excluded the evidence found in the pocketbook we cannot impute reversible weight to its admission in the circumstances. We note that the appellant does not now claim that the statement alleged to have been made by him at the preliminary hearing was not properly admissible to impeach his credibility. Even if it was error to admit it, constitutionally or otherwise, we are able to say that it was harmless beyond a reasonable doubt. In the context in which it was admitted, it was not considered as to the fact of possession or control by the appellant of any of the narcotics found. The credibility of the witness is a matter for the trier of fact in any event, and the court could have disbelieved the denials and explanations of the appellant without the admission of the evidence tending to impeach him. *Presley v. State*, 6 Md. App. 419. In the unusual circumstances here we do not feel that we are compelled to reverse the judgments nor

---

the search. See also *Frank v. State*, 189 Md. 591. And as to standing to object generally see *Alderman v. United States*, 89 S. Ct. 961; *Mancusi v. DeForte*, 88 S. Ct. 2120. Cf. *Jones v. United States*, 362 U. S. 257. Nor do we reach the question whether the mother voluntarily consented to the search in the circumstances and, if so, whether her consent bound the appellant. See *Anderson v. State*, 237 Md. 45; *Hall v. Warden*, 313 F. 2d 483 (4th Cir. 1963). For a discussion of search by consent see "Search and Seizure: The Course of True Law . . . Has Not . . . Run Smooth" by Wayne R. LaFave, Illinois Criminal Procedure (I) Vol. 1966, pp. 255, 312-322.

11. *Chapman v. California*, 386 U. S. 18.

do we think that the ends of justice would be served by so doing.

We observe, however, that when challenge to evidence is made during trial on the ground of an unreasonable search and seizure, it makes for more orderly procedure, even when the court is the trier of fact, for the court to hear all of the evidence properly offered on the issue, make its ruling as to admissibility and then continue with the case on the merits.[12]

*Judgments affirmed.*

---

12. "If the case is being tried before a jury the hearing on the motion (to exclude or suppress the evidence), or on an objection to the introduction of evidence alleged to have been obtained by an unlawful search or seizure, shall be out of the presence of the jury." Md. Rule 729d 2.