UNITED STATES of America,

v.

Thomas D. HARRIS, Appellant.

No. 22742.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 10, 1970.

Decided Aug. 12, 1970.

Petition for Rehearing Denied
Sept. 22, 1970.

Mr. Richard A. Merrill, Washington, D. C. (appointed by this Court), for appellant.

Mr. Gregory C. Brady, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Mr. David G. Bress, U. S. Atty., at the time the record was filed, also entered an appearance for appellee.

Before TAMM, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Appellant and two others (Henson and Jordan) were convicted of armed robbery, and assault with a dangerous weapon, the conviction of appellant Harris resulting in a sentence of 7 years under the Youth Corrections Act.[1] Appellant raises questions, first, in regard to the search of his apartment and seizure of evidence therein, and second, as to the sufficiency of the evidence. We find that the seized evidence was properly admitted, and that this along with other evidence in the case was sufficient for the jury to find appellant guilty as charged.

### I. Pertinent Evidence

#### A. Events Leading Up to the Entry into Appellant's Apartment

In the afternoon of 24 May 1968 the Merkle Press, Inc., was robbed by three armed men as two employees were delivering the weekly payroll to the Merkle shipping department. One of the employees were wounded. In the routine handling of the Merkle payroll every Friday around 3 o'clock cash was delivered by an armored car to the central payroll department, from which at a definite time pay envelopes were

---

[1]. 18 U.S.C.A. § 5010 (1969).

handcarried to the other buildings of the Merkle Press. With the exception of the exact route followed by the pick-up men, varied slightly each Friday, the timing and the routine of paying in cash between 3:00 and 4:00 was precisely the same, and would be known to any employee or ex-employee of Merkle Press. On the afternoon after the robbery, since the shipping department employees had not been paid, the paymaster issued checks to all employees at about 4:15 p. m. Appellant Harris, although he checked out at 4:30 p. m., was the only employee who departed that day without picking up his check.

Eyewitnesses described the three robbers and identified their get-away car by license number and description as a maroon Chevy II Nova. A quick record check showed the license tag to be registered to a different car, a 1957 Ford owned by one *William* Harris, living on Anacostia Avenue, S. E. By sheer chance a police officer remembered that he had recently given a traffic ticket to a *Thomas* Harris (the appellant herein) driving a maroon Chevy II Nova, and in checking his records discovered that the address *Thomas* Harris had given was 3535 J Street, N.E. Police cruisers immediately went to both Anacostia Avenue, S.E. and J Street, N.E. to look for the reported get-away car. One police cruiser spotted a Chevy II Nova, later determined to be owned by appellant Thomas Harris, in a parking lot near 3535 J Street. The engine was still warm, the license plates were missing, but license plate bolts were lying on the ground beneath the rear bumper. By this time the officers had also ascertained that the Merkle Press shipping department had an employee named Harris.

Upon receiving the report of the discovery of the car, Sgt. Arscott, Sgt. Blake, and two other police officers drove to 3535 J Street, N.E. While about one block away Sgt. Arscott observed one Jordan (later named as defendant and convicted herein) and an unidentified young man. Recognizing Sgt. Arscott, Jordan fled into a nearby apartment. After inspection of the Chevy II Nova the four officers then proceeded to appellant Thomas Harris' apartment to continue their investigation. With prudence inspired by their knowledge that an armed robbery had just been committed and one employee wounded, Sgt. Blake carried a shotgun in plain view.

When Sgt. Arscott knocked on Harris' apartment door, a voice from inside inquired "Who is it?" The Sgt. replied "Police." Immediately the officers heard footsteps and considerable movement from inside the apartment as if furniture were being shifted. After a one and a half minute interval Sgt. Arscott repeated the announcement that they were police officers and told those inside to open the door. One Henson (also defendant and convicted herein) then opened the door. With Henson was a juvenile, but neither appellant Harris nor Jordan.

Henson and the juvenile were well and unfavorably known to Sgt. Blake from prior encounters, resulting in their arrests for housebreaking, auto theft, and other offenses. Henson resembled the general description given of one of the three robbers. Most significantly, however, as they stood at the threshold of the apartment the officers saw through the open door large stacks of coins on the dining room table, a sight which aroused the logical suspicion that these stacks of coins were part of the stolen payroll.

### B. Entry, Search and Seizure

Following this rapid-fire sequence of events, the officers entered the apartment "almost instantly" after the door opened. Sgt. Arscott's testimony was that he was not certain whether Henson let him into the apartment or if he asked if he could enter, but that, Henson stepped back as he opened the door, allowing the officers to enter. On inquiry Henson explained that the coins had been saved by a sister, cousin, or girlfriend. While Sgt. Arscott went downstairs to call to ascertain the exact con-

tent of the payroll, the other officers walked around the living-dining room, but did not enter other rooms of the apartment. One detective observed through the open door of the living room closet a pistol butt protruding from a box on the top shelf. After being shown this, Sgt. Arscott removed the box from the shelf, and in so doing discovered two other pistols and a shoulder holster in the box. The three pistols matched the description of the weapons used in the robbery that afternoon. One pistol was found to have been purchased by appellant Thomas Harris eight months before. Ballistics tests proved this the gun which had fired the shot wounding the Merkle employee.

After the discovery of the pistols Henson and the juvenile were formally advised that they were under arrest. Sgt. Arscott then went into the bedroom, pulled back the mattress, and uncovered approximately $5,000.00. Appellant Harris was subsequently arrested elsewhere.

## II. Motion to Suppress the Evidence Found in the Apartment

### A. Probable Cause to Arrest— Entry without Warrant

 Appellant argues[2] that the evidence obtained from his apartment should have been suppressed because the police entry and arrest of co-defendant Henson was unlawful, and therefore the search which followed the entry and arrest was an illegal search. To evaluate this argument we now consider the situation as known to the police of-ficers as they stood in the hallway outside the threshold of appellant Harris' apartment just prior to entry:[3]

1. The armed robbers had fled in a maroon Chevy II Nova, bearing license plates registered to a Ford owned by one *William* Harris;

2. Another Harris, i. e., appellant *Thomas* Harris, bearing the same last name as the man to whom the license plates were registered, owned a maroon Chevy II Nova;

3. A Chevy II Nova, a car answering the description of the get-away vehicle, with the engine and exhaust still warm, bearing no license plates, and with the bolts for the license plates lying on the ground under the rear bumper, was parked near the address of appellant Thomas Harris;

4. A person named Harris worked for the Merkle Press which had been robbed an hour before;

5. Part of the money taken in the robbery consisted of coins;

6. When the four policemen knocked at the door of Harris' apartment and identified themselves, the occupants within were slow in answering and sounds of movement of people and furniture were heard;

7. The individual Henson answering the door fit roughly the description of one of the robbers;

8. One of the police officers not only recognized Henson, but knew that he had been involved in prior offenses of housebreaking and auto theft; and

9. Simultaneously with the opening of the door, but before they crossed the

2. While appellant has not specifically argued that the entry without warrant invalidated the arrest and search, the issue is clearly present on the facts of this case. We consider it here because our recent holding in Dorman v. United States, 140 U.S.App.D.C. ——, 435 F.2d 385 (April 15, 1970) (*en banc*) makes clear that entry without warrant for the purpose of making an arrest, is, subject to exceptions in proper circumstances, governed by the Fourth Amendment prohibition of warrantless intrusion into a private dwelling.

3. In addition to the factors recounted below, the trial court based its finding that the officers had probable cause on a representation made by the prosecuting attorney that the officers had been told by neighbors that four men had been seen getting out of the Chevy II and entering the apartment. This information was never put in evidence, either at the hearing on the motion to suppress or at trial. Hence it cannot be used to support a determination that probable cause existed. Therefore we ourselves consider whether probable cause existed based only on those facts actually in evidence.

threshold, the police officers saw stacks of coins in various denominations on the dining room table within.

On the knowledge the officers had before coming to appellant Harris' apartment (items 1–5 above), they had no probable cause to secure a warrant for anyone's arrest. Although they had been led to appellant Harris' apartment by the fortunate recollection of a recent traffic arrest plus the description of Harris' automobile matching that of the get-away car, Harris himself was an employee of the Merkle Press and had certainly not been identified as one of the three robbers. Until the officers saw Jordan prior to entering the building and saw Henson in the apartment, they had no suspicion that either of them was involved in the robbery.

In Dorman v. United States, 140 U.S.App.D.C. ——, 435 F.2d 385, decided April 15, 1970, this court *en banc* decided the question of "whether the general requirement of a warrant as a condition for entry into a house is subject to an exception where the entry is for the purpose of making an arrest of a suspected felon."[4] In so doing, we said: "the basic principle, the constitutional safeguard that, with room for exceptions, assures citizens the privacy and security of their homes unless a judicial officer determines it must be overridden, is applicable not only in case of entry to search for property, but also in case of entry in order to arrest a suspect."[5] But further, this "room for exceptions" includes the situation where "the requirement of a warrant may be excused where circumstances do not tolerate delay, like that incident to obtaining a warrant, of an officer making an arrest."[6]

 In discussing "the principle of urgent need as establishing an exception justifying a warrantless entry to make an arrest", this court in *Dorman* referred to a number of material considerations, most of which are pertinent to the case at bar.[7]

First that a grave offense is involved, particularly one that is a crime of violence.

Here three armed robbers had snatched a payroll and wounded one of the payroll carriers.

Second, and obviously interrelated, that the suspect is reasonably believed to be armed. Delay in arrest of an armed felon may well increase danger to the community meanwhile, or to the officers at the time of arrest. This consideration bears materially on the justification for a warrantless entry.

The officers reasonably believed the robbers, if they were encountered, would be armed, and on that belief Sgt. Blake carried a shotgun as he proceeded to the suspect's apartment. The pistol which had fired the shot wounding the Merkle employee was actually found within the apartment.

Third, that there exists not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a clear showing of probable cause, including "reasonably trustworthy information," to believe that the suspect committed the crime involved.

This point will be discussed at some length below.

Fourth, strong reason to believe that the suspect is in the premises being entered.

In response to the officer's knock the door was opened by the defendant Henson, who answered the description of one of the robbers, and simultaneously the officers saw the coins on the table.

Fifth, a likelihood that the suspect will escape if not swiftly apprehended.

To some extent this consideration was present here. If, after seeing Henson and the coins the officers had been required to obtain a warrant, the occupants of the apartment, now aware of the officers' interest in them, might

---

4. Dorman v. United States, *supra*, 140 U.S. App.D.C. at ——, 435 F.2d at 390.

5. *Id.*

6. *Id.*

7. *Id.* 140 U.S.App.D.C. at ——, —— - ——, 435 F.2d at 391, 392–393.

well have used the ensuing interval to escape.

Sixth, the circumstance that the entry, though not consented, is made peaceably.

The entry here, whether there was consent or not, was made peaceably without the use of force, except as to whatever extent the display of arms may be construed as force.[8]

Up to a certain time in the development of the case at bar the facts are not entirely comparable to *Dorman.* For, in *Dorman,* the police had probable cause to arrest prior to going to Dorman's residence, but were temporarily unable to obtain a warrant. They thus went to Dorman's residence without a warrant for the purpose of effecting his arrest. Here, however, the police approached appellant Harris' apartment, not for the purpose of making an arrest, but rather in order to continue their investigation of an unsolved robbery. Since the officers did not have probable cause to arrest anyone when they knocked on the door of Harris' apartment, they cannot be faulted for prior failure to obtain an arrest warrant.

Probable cause sprang into being only upon the opening of the door in response to the officer's knock, the tentative identification of Henson, and most importantly, the simultaneous revelation of the stacks of coins upon the table inside, clearly visible from outside the threshold of the apartment. At this point the rationale and justification for warrantless entry to make a lawful arrest, as stated by this court in *Dorman,* came into play. At the moment the door was opened and the probable loot from the robbery was unveiled, the officers were face to face with prime suspects and concatenately supplied with sufficient probable cause to arrest these suspects. At this point the officers cannot have been expected to have bowed out and returned to headquarters to procure a warrant. To retain control of the prime suspects and the visible loot they needed to make an immediate arrest, which they did.

In truth and in fact, probable cause, exigent circumstances, and the prospect of unreasonable delay in obtaining a warrant, all converged and manifested themselves at the moment that the door was opened and revealed the apartment's contents, both human and material. As of this moment the actions of the police officers were justified by the rationale expounded by this Court in *Dorman* and many of the cases relied upon therein.

In the language of *Dorman* there was an "urgent need * * * justifying warrantless entry to make an arrest." We therefore conclude that the police had probable cause for the arrest, and the exigencies of the circumstances demanded that they enter the apartment immediately without warrant in order to effect the arrest.[9]

---

8. Our prior cases have established that entry obtained through a display of arms cannot be regarded as an entry with consent of the occupant. Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963); Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951). However, *Dorman* makes clear that the fact of an unconsented but nevertheless peaceful entry, *i. e.,* without the use of actual physical force, is relevant to a determination of the propriety of entering without a warrant to effect an arrest.

9. In United States v. Curtis, 138 U.S.App. D.C. 360, 427 F.2d 630, decided May 19, 1970 by this court on rehearing *en banc,* the factual situation likewise "made it reasonable for the police to set forth at once without waiting for a warrant, and to come prepared for exigencies." (138 U.S.App.D.C. at 362, 427 F.2d at 632). In *Curtis* this court did not attempt to determine whether the facts known to police prior to their encounter with Curtis would have constituted probable cause for a warrant, but we did point to two additional facts which came to light as the door of the upstairs apartment was opened. In *Curtis* those facts were: one, the witness identified Curtis as the robber; secondly, Curtis started to run. In the case at bar when the door opened one of the officers identified Henson as matching the description of one of the robbers, and all the officers saw the coins stacked on the dining room table. In the language of this court in *Curtis,* those additional facts were "pertinent both on the issue of probable cause for arrest, and on the urgent need of taking action forthwith,

## B. Lawfulness of the Manner of Entry into Appellant Harris' Apartment

Appellant also contends that, even if the officers had probable cause to arrest, yet the manner of entry into appellant's apartment was unlawful and therefore the search and seizure following must be declared illegal. In support of this appellant points to an alleged failure of the officers to announce their purpose and meet the requirement of 18 U.S.C. § 3109,[10] and to an alleged hazy recollection on the officers' part as to the exact sequence of events at the time they crossed the apartment threshold. Section 3109 requires that officers executing a search warrant must, unless their *entry is consented to,* give notice of their authority and purpose and be refused entry before they can break into the premises to be searched. These requirements have been held to apply equally to entries for the purpose of making an arrest without warrant. Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

In evaluating both the recollection of the officers and their meeting or failure to meet the requirements of § 3109, we recapitulate the pertinent circumstances as the officers stood on the threshold. Three armed men had wrested a payroll from plant employees less than an hour before; one employee had been shot by the miscreants; the automobile registered to Harris had been found nearby with the motor warm; the officers were approaching the apartment known to be occupied by Harris, an employee of the company robbed. The officers prudently came prepared to meet violent resistance; one officer carried a shotgun prominently displayed and perhaps two others had pistols drawn.[11] When the officers knocked on the door, they did not know whether they would be greeted in a normal manner or answered by a hail of bullets. They were greeted in a furtive manner and they instantly sighted a pile of coins, which supplied them with probable cause to believe they were face to face with the armed robbers. The vagueness of the police sergeant's testimony as to exactly what he said and his sequence of movements at this critical time can be explained by normal human reaction at a time of tense expectancy. Given these circumstances, human recollection would customarily lack precision, and it would be strange if Sgt. Arscott did indeed recall precisely what he said and what steps he and Sergeant Blake took in entering the room. At such a moment we do not think that § 3109 requires police officers to execute a carefully schooled quadrille and await precise proper responses before moving.

The normal reaction in such a situation would be for the officers to move quickly into the room, dominate the situation, prevent any resistance, and take a quick look for the third member of the robbery gang (only two persons were visible) who might be hiding elsewhere in the apartment. The sight of the coins piled on the table would certainly inspire the officers in this normal reaction and apparently that is what occurred. The officer's failure to comply precisely with the requirements of § 3109 was justified by the exigencies of the situation which demanded they act quickly in the interest of their own safety.[12] The fact that the officers

without waiting for a warrant, in making an unconsented entry for the purpose of arrest." (138 U.S.App.D.C. at 363, 427 F.2d at 633).

10. 18 U.S.C. § 3109 provides:
 The officer may break open any outer or inner door or window of a house, or any part of a house or anything therein, to execute a search warrant, *if, after notice of his authority and purpose, he is*

*refused admittance* or when necessary to liberate himself or a person aiding him in the execution of the warrant. (Emphasis added.)

11. The testimony as to whether or not the other officers had drawn their weapons is inconclusive.

12. While the Government does not argue that the necessities of the situation ex-

stated as they entered, "we are investigating a robbery," rather than "you are under arrest," should not be grounds for invalidating the arrest which was, in effect, made at the moment of entry; this is particularly so, when, up until the instant the door opened, the officers' purpose was in fact still investigatory.

In the instant case it is clear that the entry cannot be regarded as consented to, Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649 (1951); Gatlin v. United States, 117 U.S.App.D.C. 123, 326 F.2d 666 (1963), and the Government does not argue that consent was given. As we held in Keiningham v. United States, 109 U.S.App.D.C. 272, 287 F.2d 126 (1960), an entry without consent ordinarily amounts to a "breaking" under the statute and requires that the officers first announce their purpose and authority.

[T]he word "break" as used in 18 U. S.C. § 3109, means "enter without permission." We think that a "peaceful" entry which does not violate the

provisions of § 3109 must be a permissive one, and not merely one which does not result in a breaking of parts of the house.[13]

Making known their identity as police officers is apparently sufficient notice of authority.[14] However, it is generally held that the purpose of the desired entry must be specifically given. As this court stated in Gatlin v. United States,[15] section 3109 requires that

before entering to search or make an arrest, an officer must announce his purpose as well as his authority. * * * Here, admittedly, there was no announcement of purpose prior to entry. Even assuming probable cause for [defendant's] arrest, this failure alone makes the arrest illegal.

And in Miller v. United States, where the defendant attempted to slam his door, when he determined that police officers were seeking entry, the Supreme Court held that this action

might be the basis for the officers being virtually certain that the petitioner knew there were police at his

---

cused the officers' failure to comply with § 3109, we are of the opinion that such exigent circumstances clearly existed, and that they justified the action taken here.

13. *Keiningham, supra,* 109 U.S.App.D.C. at 276, 287 F.2d at 130. The Government seems to suggest that since the entry was "peaceful", i. e., without the use of physical force, that § 3109 need not be complied with. In support of this rationale the Government cites Chappell v. United States, 119 U.S.App.D.C. 356, 342 F.2d 935 (1965); Washington v. United States, 105 U.S.App.D.C. 58, 263 F.2d 742 (1959); and Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476 (1953). However, the *Washington* and *Ellison* opinions were written before our decision in *Keiningham, supra.* Furthermore, neither *Washington* nor *Ellison* mentioned § 3109 and it does not appear that that statute was relied upon by the appellants in those cases.

In *Chappell,* which post-dates our *Keiningham* decision, the issue of compliance with § 3109 was raised. The *Chappell* court, however, decided that any possible failure to comply with § 3109 in that case was excused by exigent circumstances and that in any event the authority and purpose of the officers there was

communicated prior to entry. The court in *Chappell* stated:

We find the totality of circumstances in this case reveals that *the police entry here was [1] made in "necessitous haste" [2] after proper manifestation of authority and purpose.*

119 U.S.App.D.C. at 359–360, 342 F.2d at 938–939 (emphasis added).

We therefore do not adopt the Government's position in the instant case that the officers' failure to specify their purpose was excused merely because the entry was "peaceful." While the entry here was "peaceful" in the sense that no physical force was used, and as such would tend to support police entry without warrant in exigent circumstances, see Dorman v. United States, 140 U.S.App.D.C. ——, at —— – ——, 435 F.2d 385, at 393–394, (April 15, 1970, en banc) it was nonetheless without consent and therefore constituted a "breaking" under the statute.

14. Miller v. United States, 357 U.S. 301, 312, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); Gatlin v. United States, 117 U.S. App.D.C. 123, 130, 326 F.2d 666, 673 (1963).

15. 117 U.S.App.D.C. 123, 130, 326 F.2d 666, 673 (1963).

door conducting an investigation. This, however, falls short of a virtual certainty that the petitioner knew of their purpose to arrest him. The requirement is not met except by notice of that purpose, for the Government admits that the officers had no authority to break the petitioner's door, except to arrest him. We must, therefore, conclude that the petitioner did not receive the required notice of authority and purpose.[16]

It is clear from the record in the instant case that the police failed to state a purpose of making an arrest before they entered. Nevertheless, the Supreme Court has twice indicated that exigent circumstances may provide an exception to the requirements of § 3109. Miller v. United States, *supra*, at 309, 78 S.Ct. 1190; Sabbath v. United States, 391 U.S. 585, 591, 88 S.Ct. 1755, 20 L. Ed.2d 828 (1968).[17] And the lower courts have applied the exigent circumstances exception to § 3109 cases. *See, e. g.*, Gilbert v. United States, 366 F.2d 923 (9th Cir 1966), cert. denied, 388 U. S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967); Chappell v. United States, 119 U.S.App.D.C. 356, 342 F.2d 935 (1965).[18]

In the instant case the officers had a right to act quickly to protect themselves when suddenly confronted with two in-dividuals reasonably believed to be armed robbers, especially in view of the fact that the officers knew there existed a third gunman who was not in sight. In this connection, we note that the Supreme Court in *Sabbath* in refusing to find an unannounced entry excused by exigent circumstances stated that "[t]he agents had no basis for assuming petitioner *was armed or might resist arrest,* * * * "[19] As the Ninth Circuit observed in *Gilbert*, "it would be difficult to justify refusal to excuse prior announcement where to require it would create palpable peril to the life or limb of the arresting officers."[20] We therefore conclude that on the operative facts here, the failure to meet with delicate exactitude the requirements of § 3109 did not invalidate the subsequent arrest and search.

### C. Lawfulness of the Search of the Premises

Although Sgt. Arscott did not formally advise Henson and the juvenile that they were under arrest until he discovered the three pistols, he testified that they were not free to leave the apartment after he saw the money on the table through the open door. We therefore treat the arrest as taking place when the officers entered the apartment.[21] The search then was a search

---

16. 357 U.S. 301, 312–313, 78 S.Ct. 1190, 1197 (1958).

17. Indeed, in a footnote in *Sabbath* the Supreme Court stated:
 Exceptions to any possible constitutional rule relating to announcement and entry have been recognized, see Ker v. California, [374 U.S. 23] * * * at 47, [83 S.Ct. 1623, 10 L.Ed.2d 726] (opinion of Brennan, J.), and there is little reason why those limited exceptions might not also apply to § 3109, since they existed at common law, of which the statute is a codification.
 391 U.S. at 591, n. 8, 88 S.Ct. at 1759.

18. *See also* Bosley v. United States, 138 U.S.App.D.C. 263, at 267–268, 426 F.2d 1257, at 1261–1262 (April 9, 1970).

19. 391 U.S. at 591, 88 S.Ct. at 1759.

20. Gilbert v. United States, 366 F.2d 923, 932 (9th Cir. 1966).

21. Although, on this analysis, testimony as to Henson's statement explaining the stacks of coins as the property of a sister or girl friend was erroneously admitted, since he had not yet been advised of his rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), we find that in the totality of the circumstances of this case, such error was harmless beyond a reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). The statement was entirely exculpatory and, in the circumstances presented, its admission could not have prejudiced appellant Harris, even if he should have standing to object to its use. Furthermore, since the officers had probable cause when they entered, even if the arrest did not take place until after discovery of the guns, such a conclusion would not necessarily require exclusion of the coins and the first gun discovered, since they were

incident to a lawful arrest, lawful because based on probable cause at the time, even though without a warrant.

We consider three items of evidence: the stack of coins on the dining room table, the three guns in the closet, and the $5,000.00 under the mattress in the bedroom.

As to the coins and the guns, we think no problem arises under any standard. The coins were the probable loot from the robbery, visible from outside through the open door. The two persons arrested were in the living room—dining room. Through an open door of a closet in the living room, the officers spotted the protruding butt of a pistol in a box on the closet shelf. In removing this they discovered two other pistols and a shoulder holster. The officers were in-

vestigating an armed robbery in which an employee of the victimized company had been shot about an hour before. Hence they were completely justified in searching the immediate area surrounding the two men arrested for possible weapons. Having discovered one pistol, they found two more in the same place, and it was their duty both for their own protection and for use as evidence to seize the weapons.[22]

As to the search of the adjoining bedroom and discovery of the $5,000.00 in bills under the mattress, it was within the permissible area of search as defined by Supreme Court decisions in United States v. Rabinowitz,[23] Harris v. United States,[24] and subsequent cases.[25] It probably would not be within the narrower range of permissible search incident to arrest as de-

found in plain view and not as the result of a search. *See* Ker v. California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), and note 22 *infra*.

22. Additionally, these items were seizable under the "plain view" doctrine. As we recently stated in United States v. Thweatt, 140 U.S.App.D.C. 120, at 126, 433 F.2d 1226, at 1232 (June 30, 1970):

Recognizing our responsibility to view the Fourth Amendment under the standard of reasonableness, we hold that it is well within the criteria of existing cases for the police to seize fruits, instrumentalities or evidence of crime which they recognize to be of importance to the prosecution of the arrestee when the items involved are in plain view of the police when they enter the premises to make the arrest. * * *

*Thweat* (140 U.S.App.D.C. at 123–124, 433 F.2d at 1229–1230) explicitly decided that seizure of items in plain view is not governed by the restrictions placed on the scope of a search incident to an arrest by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *Accord*, Dorman v. United States, 140 U.S.App.D.C. ——, 435 F.2d 385 (April 15, 1970). *See also*, ALI Model Code of Pre-arraignment Procedure, Part II. Search and Seizure, §§ SS 1.03(1), SS 3.01(1), (2) (Tent.Draft No. 3, 1970).

As to the two guns found in the box after removing it from the shelf, we think

that under the special circumstances here, they would be properly admitted even if the arrest is regarded as not taking place until after their discovery. Having seen the butt of one pistol protruding from a box on the closet shelf in plain view, the officers should not be required to attempt to remove it from the box without disturbing the box itself. The only safe and reasonable approach for the officers to take in handling this potentially loaded, deadly weapon was to remove the box from the closet in order safely to extract the pistol from the box. Having done this and discovered two more pistols in the box in the process, the officers were not required to disregard them.

23. 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

24. 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947).

25. *E. g.*, Ker v. California, 374 U.S. 23, 42, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Abel v. United States, 362 U.S. 217, 235–239, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *cf.*, Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L.Ed.2d 142 (1964). In *Harris* the Court upheld the warrantless, incident to arrest search of an entire four room apartment. *Rabinowitz* approved the intensive search of a one room business office, including the desk, safe and file cabinets, again as incident to an arrest.

fined in Chimel v. California.[26] In *Chimel* the Supreme Court said:

> There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well recognized exceptions, may be made only under the authority of a search warrant.[27]

■ Assuming that the search in the bedroom and the seizure of the $5,000.00 from the payroll robbery did not meet the *Chimel* standard, the question then becomes whether *Chimel* is to be applied retroactively.[28] We think the Supreme Court implied in the *Chimel* opinion itself that it was knowingly creating a new constitutional standard for search and seizure, one that had not been applied (at least consistently applied) by the Supreme Court before. The Court said "It is time, for the reasons we have stated, to hold that [the *Rabinowitz* and *Harris* cases] on their own facts, and insofar as the principles they stand for are inconsistent with those that we have endorsed today, they are no longer to be followed." [29]

In considering whether the *Chimel* standard should be applied retroactively to determine if appellant's Fourth Amendment rights were violated in this case, we follow the three factor analysis set forth by Judge MacKinnon for this court in Woodard v. United States.[30]

1. Whether the underlying purpose of the new standard would be served by applying it retroactively to prior cases.

26. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

27. *Id.* at 763, 89 S.Ct. at 2040.

28. The Supreme Court has thus far expressly refrained from deciding this issue. *See* Vale v. Louisiana, 399 U.S. 30, 90 S. Ct. 1969, 26 L.Ed.2d 409; Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969); Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969).

29. 395 U.S. at 768, 89 S.Ct. at 2042. Appellant argues that *Chimel* did not in fact establish a new standard but rather merely clarified previous law, and that the *Chimel* holding had been clearly foreshadowed in prior decisions. We cannot agree. This court has recently stated that the Supreme Court in *Chimel* "importantly restricted the scope of a search of premises that could be made without a warrant on the ground that it was incident to arrest * * *." Dorman v. United States, 140 U.S.App.D.C. ——, at ——, 435 F.2d 390 (April 15, 1970, *en banc*). *See also* United States v. Thweatt, 140 U.S.App.D.C. 120, at 123, n. 4, 433 F.2d 1226, at 1229 (1970), recognizing but not deciding the question of *Chimel's* retroactivity. Furthermore, as the Third Circuit has recently observed,

Desist v. United States, 392 U.S. 244, at 248, 89 S.Ct. 1030, 22 L.Ed.2d 248; Johnson v. New Jersey, 384 U.S. 719, at 734, 86 S.Ct. 1772, 16 L.Ed.2d 882; and Linkletter v. Walker, 381 U.S. 618, at 629–636, 85 S.Ct. 1731, 14 L.Ed.2d 601, which denied retroactivity to decisions overruling cases already substantially undermined, make it clear that the burden of asserting that a decision has been foreshadowed and hence raises no retroactivity issue is heavy, at least where an uncontradicted, if discredited, Supreme Court opinion exists.
United States ex rel. Allison v. New Jersey, 418 F.2d 332, 341 n. 20 (3rd Cir. 1969).

30. 139 U.S.App.D.C. 37, 429 F.2d 716 (June 4, 1970). These three factors are those which have been developed by the Supreme Court to provide a framework for considering the potential retroactivity of new rules of criminal procedure. *See* Desist v. United States, 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). For a comprehensive discussion of the Supreme Court's standards for determining retroactivity questions, see the scholarly opinion of the late Judge Stahl in United States ex rel. Allison v. New Jersey, 418 F.2d 332 (3rd Cir. 1969).

Recent cases indicate that a new rule is most properly applied retrospectively if it tends to enhance the reliability of the fact finding or truth determining process. The main purpose of the *Chimel* rule is quite clearly to deter police from conducting overly broad searches without the authority of a warrant. The first and critical factor [31] in the retroactivity analysis thus points against retroactive application of *Chimel*. In Desist v. United States,[32] Justice Stewart for the Court, relying on Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), stated: "in contrast with decisions which had been accorded retroactive effect, 'there is no likelihood of unreliability or coercion present in a search and seizure case'; the exclusionary rule is but a 'procedural weapon that has no bearing on guilt,' and 'the fairness of the trial is not under attack.' " And as we said in *Woodard*, "These decisions indicate that the purpose of the rule [against use at trial of an accused's testimony given on a motion to suppress seized evidence] * * * is not one the violation of which is always to be considered prejudicial since the purpose of the constitutional privileges against self-incrimination and unreasonable searches is not to

aid in the search for truth. In fact, in many cases where these privileges are asserted they operate to prevent the full truth from being known. Tested by this standard, the purpose of the rule * * does not require retroactive application." [33]

2. The likely effect of retroactive application on the orderly administration of justice. Largely on the basis of this factor, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) refused retroactivity to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), even though *Wade* and *Gilbert* were decisions dealing with standards affecting the truth determining process itself, *i. e.*, the reliability of eye-witness identifications.[34] In the case at bar the effect of making *Chimel* fully retroactive would be to inspire collateral proceedings challenging thousands of cases in which evidence was seized incident to arrest,[35] an appalling prospect for the administration of the overburdened United States Courts. Nor do we think that we should, as appellant urges, grant limited retroactivity by applying *Chimel* only to those cases still subject to direct review at the time of

31. Desist v. United States, 394 U.S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) ; United States ex rel. Allison v. New Jersey, 418 F.2d 332, 345 (3rd Cir. 1969).

32. 394 U.S. 244, 250, 89 S.Ct. 1030, 1034 (1969).

33. Woodard v. United States, 139 U.S.App. D.C. 37, 41, 429 F.2d 716, 720 (June 4, 1970). In contrast, Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968) and Berger v. California, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969) held retroactive the safeguards to a defendant's right to confront and cross-examine witnesses which had been announced in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), respectively. The obvious interrelationship between the opportunity to cross-examine witnesses and the ability of the trier of fact to judge

the witness' credibility made retroactive application imperative in these cases, in order to assure the integrity of the truth determining process.

34. The Court noted that if the *Wade/Gilbert* rules were to be retroactively applied, At the very least, the processing of current criminal calendars would be disrupted while hearings were conducted to determine taint, if any, in identification evidence, and whether in any event the admission of the evidence was harmless error. Doubtless, too, inquiry would be handicapped by the unavailability of witnesses and dim memories. 388 U.S. at 300, 87 S.Ct. at 1971.

35. Available statistics indicate that up to the present time, the overwhelming majority of police searches have been conducted incident to arrest, without the benefit of a search warrant. *See* ALI Model Code of Pre-arraignment Procedure, Introductory Memorandum, (tent. draft no. 3, 1970).

its decision. It is true that Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) granted such limited retroactivity to the Mapp v. Ohio [36] requirement that the rule excluding illegally seized evidence apply to state trials. Nevertheless, it is clear that such a result is not compelled in the instant case. On the contrary, the Supreme Court has apparently been moving away from the employment of limited retroactivity toward a formula requiring either full prospectivity or complete retroactive application.

In Desist v. United States, 394 U.S. 244, 252, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), also a case involving a new Fourth Amendment rule, the Court explained that in those cases where it had explicitly adopted a limited retroactivity approach, such retroactivity had already been implemented without discussion in prior cases concerning the new rules in question. Desist gave full prospectivity to the rule against non-trespassory eavesdropping announced in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In reaching this result, the Court recounted that

> Petitioners point out that in Linkletter, the only other case involving the retroactivity of a Fourth Amendment decision, the Court held Mapp applicable to every case still pending on direct review on the date of that

decision. A similar approach was adopted in Tehan v. [United States ex rel.] Shott, 382 U.S. 406, [86 S.Ct. 459, 15 L.Ed.2d 453], with respect to the prospectivity of Griffin v. California, 380 U.S. 609, [85 S.Ct. 1229, 14 L.Ed.2d 106]. In Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, however, we abandoned the approach taken in Linkletter and Tehan and concluded that "there are no jurisprudential or constitutional obstacles" to the adoption of a different cut-off point.[37]

We therefore conclude that the instant case is directly governed by Desist. In the words of the Court there, "Because the deterrent purpose of [Chimel] overwhelmingly supports nonretroactivity, we would reach that result even if relatively few convictions would be set aside by its retroactive application." [38]

3. The possible reliance by police, prosecutors, and courts upon the antecedent standard of law. Chimel explicitly overruled a line of cases which had authorized much broader boundaries within which a search incident to a lawful arrest could be carried out, e. g., Harris, Rabinowitz, and their progeny.[39] Periodically the Supreme Court had affirmed in one degree or another these landmark cases, and law enforcement officials necessarily had relied upon the

---

36. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961).

37. 394 U.S. at 252, 89 S.Ct. at 1035.

38. Id. at 251–252, 89 S.Ct. at 1035. Several other circuits have also reached the conclusion that Chimel should be accorded prospective application only. Williams v. United States, 418 F.2d 159, 162 (9th Cir. 1969), cert. granted, 397 U.S. 986, 90 S.Ct. 1120, 25 L.Ed.2d 394 (1970); Lyon v. United States, 416 F. 2d 91, 93 (5th Cir. 1969), cert. denied, 396 U.S. 1023, 90 S.Ct. 597, 24 L.Ed.2d 516 (1970); United States v. Bennett, 415 F.2d 1113, 1114 (2d Cir. 1969), cert. denied, Haywood v. United States, 396 U.S. 852, 949, 90 S.Ct. 113, 376, 24 L. Ed.2d 101, 256 (1969); accord, United States v. Frazier, 304 F.Supp. 467, 471 (D.Md.1969); cf., Whiteley v. Meacham,

416 F.2d 36, 41 (10th Cir. 1969); but cf., Colosimo v. Perini, 415 F.2d 804, 805 (6th Cir. 1969), apparently applying the foreshadowing principle (see note 29 supra) in the context of a vehicle search. We recognize that a number of state courts have either assumed or decided the limited or full retroactivity of Chimel. See Fresneda v. State, 458 P.2d 134, 143 (Alaska 1969); Ashby v. State, 228 So. 2d 400, 408 (Fla.App.1969); State v. Rhodes, 80 N.M. 729, 460 P.2d 259, 260 (1969); State v. Cullison, 173 N.W.2d 533, 540 (Iowa 1970) (dictum). Cf., People v. Mann, 61 Misc.2d 107, 305 N.Y.S.2d 226 (1969). Contra, Scott v. State, 7 Md.App. 505, 256 A.2d 384 (1969); People v. Edwards, 80 Cal.Rptr. 633, 458 P.2d 713 (1969).

39. See note 25 supra.

then recognized boundary limits involved in a search incident to a lawful arrest.

The police officers arresting defendant Henson and the juvenile were justified in so relying here. The trial court was therefore authorized to admit the seized $5,000.00 in money stolen from the payroll into evidence at the trial of Harris.

The truth is that the $5,000.00 *was* stolen from the payroll by the three armed robbers, aided and abetted by appellant Harris, and it would be a perversion of justice to impose retroactively a new standard of search and seizure upon the police in this case, when the police relied upon the standard set by the Supreme Court at the time they made the arrest, search and seizure. It is sufficient for the administration of justice that the *Chimel* standard be applied prospectively to judge police conduct in search and seizure.

Therefore we hold that the standards set out in Chimel v. California are not to be applied retroactively to determine whether appellant Harris' Fourth Amendment rights were violated in this case. Under the pre-*Chimel* standard we find that the search of appellant's apartment was a "search incident to a lawful arrest," as that concept was then understood. We therefore hold that the evidence seized pursuant to that search was properly admitted at trial.

### III. Sufficiency of the Evidence

 We agree with appellant's argument and the views of our dissenting colleague that in order to uphold Harris' conviction for aiding and abetting the robbers, there must be evidence to support a finding of guilty knowledge, i. e., evidence "that appellant knowingly aided and abetted the holdup." [40] In our opinion, however, there was sufficient evidence in this case for the jury to have made such a finding beyond a reasonable doubt.

In making this determination, it must not be ignored that on this issue we must view the evidence in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact, * * * " Curley v. United States, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232 (1947). Thus, the test for sufficiency of evidence is not whether a reasonable doubt was possible, but rather whether a finding of *no reasonable doubt* was possible.[41] Viewing the evidence in this case as a whole together with the reasonable inferences which could be drawn therefrom, we conclude that the jury *could* find the element of guilty knowledge, together with the other elements necessary to guilt, beyond a reasonable doubt.

To clarify matters at the outset, we note that the fact that the evidence in this case is wholly circumstantial is of no significance to the question of whether sufficient evidence was present to support a finding of guilty knowledge. Indeed, as Judge (now Justice) Blackmun has recently pointed out, "frequently, guilty knowledge is incapable of direct proof and is established, if at all

---

40. As we said in Bailey v. United States, 135 U.S.App.D.C. 95, 416 F.2d 1110, 1113 (1969), "[a] *sine qua non* of aiding and abetting * * * is guilty participation by the accused;" and as recognized by the court in White v. United States, 366 F.2d 474, 476 (10th Cir. 1966) "aiding and abetting implies guilty knowledge." The other essential elements in a conviction for finding and abetting are (1) the fact that an offense was committed by someone, White v. United States, *supra*, United States v. Provenzano, 334 F.2d 678 (3rd Cir. 1964), and (2) that

the defendant assisted or participated in the commission of that offense, United States v. Garguilo, 310 F.2d 249 (2d Cir. 1962).

41. To sustain a conviction the evidence need be "such evidence that reasonable persons *could* find guilt beyond a reasonable doubt. It is not a requirement that the evidence *compel* but only that it is *capable* of or sufficient to persuade the jury to reach a verdict of guilt by the requisite standard." Crawford v. United States, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967).

by circumstantial evidence." Anderson v. United States, 406 F.2d 529, 532 (8th Cir. 1969).

Equally invalid is the purported rationale that since none of the individual items of proof tended in themselves to show guilty knowledge, the combination of all the circumstantial facts proved was an equally insufficient basis from which the jury could infer guilty knowledge. The facts and circumstances here proved, when viewed together, were sufficient to enable the jury to conclude not only that Harris provided assistance to the robbers, but also that he knew of their purpose when he did so.[42] This does not necessarily require the jury to draw an impermissible inference on an inference, or, in the words of the dissent, "involve first assuming from the proven fact that the principals had Harris' car and gun that Harris voluntarily loaned them to the principals, and the further assumption that he knew they were going to be used to rob the payroll at his place of employment." "The rule is not that an inference, no matter how reasonable, is to be rejected if it in turn, depends upon another reasonable inference; rather, the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant a jury to conclude that defendant is guilty beyond a reasonable doubt." [43]

When viewed collectively the facts here argue against an innocent explanation: *One,* appellant's gun was used; *two,* appellant's car was used; *three,* appellant's apartment was used as a meeting place and to conceal the loot; *four,* it was appellant's own employer who was robbed of a payroll, which appellant, at the very least, would have known would be on the premises on that date; *five,* appellant was the only employee who failed to pick up his paycheck after the robbery occurred.

The first three, collectively, very persuasively support the inference that appellant provided assistance to the robbers. The fact that the robbers had the use of appellant's car, gun, and apartment on the same day practically demands the conclusion that appellant voluntarily provided the use of these items. The actions of the robbers in utilizing appellant's apartment immediately after the robbery occurred further evidenced confidence that they would be welcome and not disturbed. And the legitimate inference that appellant loaned his gun to the robbers tends at least slightly to support the further inference that appellant knew the purpose for which the gun would be used. A man just does not surrender to his friends possession of his gun, a deadly weapon, without taking more than a casual interest in its intended employment.

The true significance of item *four,* the fact that it was appellant's employer who was robbed, may have been obscured by the Government's attempt to make too much out of it. To attach real significance to this point it is not necessary to argue, as the Government does, that only the appellant and a very limited number of others could possibly have known the route the payroll handlers took and the other mechanics of handling the payroll. This stretches the inference too far. The fact that appellant's own employer was robbed achieves its proper importance in connection with the fact that appellant's apartment, his gun, and his car were used by the robbers. If appellant himself was not to participate actually in the hold-up, what better place to pick for his friends to rob than his own employer, with whose premises he was completely familiar? We find this fact

---

42. *Cf.,* United States v. Hutul, 416 F.2d 607, 617 (7th Cir. 1969), where the court said:

Defendants do not, in their briefs, look at the evidence as a whole, or in the light most favorable to the Government, but rather isolate various bits of testimony and argue that each was insufficient to support the verdicts. However, the evidence presented concerning the various accidents overlaps and cannot be viewed in a vacuum.

43. DeVore v. United States, 368 F.2d 396, 399 (9th Cir. 1966).

highly significant in connection with the legitimate inference to be drawn that appellant did indeed loan his gun, his car, and his apartment, to his friends. It provides a substantial basis for the further inference that appellant knew of the robbers' intentions when he made his property available to them. We stress that it is the *combination* of these circumstances which points to the probability of appellant's guilty knowledge. And it is, after all, the *probability* of appellant's guilt with which the jury is concerned.[44] This is so whether the evidence which tends to establish guilt does so indirectly, by proof of circumstantial facts, or directly by testimonial proof. As the Supreme Court said in Holland v. United States:[45]

> Circumstantial evidence * * * is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to *weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities.* If the jury is convinced beyond a reasonable doubt we can require no more.[46]

Finally, the failure of appellant to pick up his check after the robbery, when considered together with the rest of the evidence, also tends to support the inference of guilty knowledge. Further, even under our dissenting colleague's theory, this fact would seem to be a personal act of appellant of independent significance (albeit, an act of omission) which directly tended to show appellant's guilty knowledge and connection with the crime. Surely the jury could draw some inference relative to guilty knowledge from the fact that appellant alone of all the employees in his section failed to pick up his check. This act of appellant, coupled with the proof that appellant's gun, apartment, and car were used by the robbers could form the basis for the

44. Every jury verdict is, of necessity, a determination of probability. In a civil case, the standard for the jury can be said to be whether it is more probable than not that the defendant is liable. In a criminal case, the standard, stated in terms of probability from the individual juror's point of view, is whether it is so probable that the defendant is guilty that it would be unreasonable to believe otherwise.

45. 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

46. *Id.* (emphasis added). Cooper v. United States, 94 U.S.App.D.C. 343, 218 F. 2d 39 (1954), cited by the dissent as a stronger case for aiding and abetting a robbery than *Harris*, which was nonetheless reversed for insufficiency of evidence, is in our view actually a much weaker case.

In *Cooper*, the circumstantial evidence against appellant consisted of the fact that he was engaged in buying an automobile from another defendant in whose name the car was registered and who was identified as the actual robber. The automobile was identified as the one used in the robbery and, quite expectedly, Cooper's fingerprints were found in the car. It could be said to be Cooper's car or the other fellows'. This was virtually all of the evidence the Government had to prove the element of participation or assistance in the robbery. Additionally, the fact that Cooper had asked a cousin in North Carolina to falsely corroborate an alibi, was introduced in attempt to prove the element of guilty knowledge. The court held that since there was no proof that Cooper was not in North Carolina at the time of the robbery, but only that he asked his cousin to testify falsely that she had seen him there, the request to the cousin, "standing alone * * * is explained by terrorized innocence as well as by a sense of guilt." 218 F.2d at 41. Thus, it is clear that with respect to the element of assistance or participation in the crime, the proof in *Cooper* was substantially less than that in *Harris*. And with respect to the element of guilty knowledge, the request for a falsely corroborated alibi was akin to unexplained flight and thus was unreliable as evidence of criminal intent or guilty knowledge. See note 48 and accompanying text, *infra.*

jury to conclude that appellant was culpably involved in the crime.[47] The fact that other explanations of appellant's behavior were possible, and that opposing inferences could be drawn is not determinative. "It is for the jury to consider these opposing possibilities and to draw the appropriate inferences." Anderson v. United States, *supra*, 406 F.2d at 532–533.

Appellant's failure to pick up his paycheck was a wholly private action; he had not been accused of participation in the crime, or even questioned or suspected. We can fairly assume that all the employees in the section knew of the robbery, since they were paid by check and not in the normal fashion by cash. Yet only appellant failed to pick up his check. It would be unreasonable to speculate that only appellant, of all the employees, was unaware of the fact that checks would be distributed. While flight from an accusation of crime may be a normal human reaction, walking off without inquiry and leaving behind a week's pay is certainly not so.[48]

In summary, we believe that, under the relevant test for reviewing the sufficiency of the evidence to support a verdict of guilty, the totality of the circumstantial evidence in this case when viewed collectively was sufficient to permit the jury to infer both appellant's assistance to the robbers and his guilty knowledge of their purpose.

### IV. Judgment Inconsistent With The Jury Verdict

The indictment charged appellant with armed robbery under count one, and robbery under count two. The jury, under proper instructions, found appellant guilty under count one, armed robbery, and rendered no verdict on count two, robbery. Yet the judgment entered records that appellant was convicted of armed robbery, *robbery*, and assault with a dangerous weapon (count three).

Appellant was sentenced under Section 5010 of the Youth Corrections Act to seven years in prison, a term within the maximum limit provided for either armed robbery or assault with a dangerous weapon.

Not only is the judgment entered inconsistent with the jury's verdict, but appellant may be prejudiced in his right to

---

47. The dissent concludes:
 There might be something to the Government's point of cumulating the evidence if the five points were *weak* evidence of participation with guilty knowledge, but they do not go that far. They just have no ingredient in them which tends to fairly prove knowledgeable participation, and I disagree with the Government's thesis that this fatal omission is cured by the fact that it occurs five times. Five times nothing produces nothing.

 Admittedly every piece of circumstantial evidence is like a doughnut, it has a hole in it, i. e., it is susceptible to an innocent explanation. If five doughnuts are put on the scales, the total weight of the holes is nothing; if the doughnuts are weighed, the sum total is appreciable. The jury had its eye on the ·doughnut and not on the hole.

48. Thus we disagree with the conclusion of the dissent that in the circumstances of this case, appellant's action in failing to pick up his pay check "is not as incriminating as unexplained flight."

(dissenting opinion at 94). The reason that evidence of unexplained flight is considered an unreliable indication of guilt is that flight, when one is accused of a crime, is a normal human reaction, whether one is guilty or innocent. As was recently stated by this court:
 Flight instructions have received substantial criticism in recent years, chiefly because the risk is great that an innocent man would respond similarly to a guilty one when a brush with the law is threatened.
United States v. Vereen, 139 U.S.App. D.C. 34, at 36, 429 F.2d 713, at 715 (1970). See also, Austin v. United States, 134 U.S.App.D.C. 259, 261, 414 F.2d 1155, 1157 (1969), where we said,
 when we deal with a person's flight from the scene of or an accusation of a crime, we deal with an extraordinarily complex action, potentially prompted by a variety of motives other than guilt of the actual crime.
For the reasons expressed in the text, appellant's failure to pick up his pay check is an entirely different kind of action than an unexplained fleeing.

release from prison, or in other ways, if the patent inconsistency between verdict and judgment is left uncorrected.

Therefore, under 28 U.S.C. § 2106, the case is remanded to correct the judgment to reflect that appellant Harris was convicted of armed robbery and assault with a dangerous weapon, which convictions are

Affirmed.

MacKINNON, Circuit Judge (dissenting).

My dissent in this case goes only to the decision of the panel that the evidence is sufficient to support the verdict. On the other points I would be in general agreement.

It is the thesis of the government that Harris' conviction of aiding and abetting the payroll robbery of the Merkle Printing plant is supported by the following collocation of facts and circumstances:

(1) testimony that the gun, which was used in the robbery and which wounded the victim was purchased by Harris;

(2) the bill of sale, Government Exhibit #11, which clearly established that Harris was the owner of the Chevy II Nova which was the get away vehicle for the three men, and the testimony that it was found near his apartment within an hour of the robbery with its engine warm;

(3) testimony that Henson, who was identified as one of the robbers, was arrested in Harris' apartment shortly after the robbery, and that the three guns used in the robbery and approximately $5,000 were recovered there;

(4) testimony that Harris was an employee of Merkle Press on the date of the offense and that only employees, or possibly ex-employees, could have known how the payroll was delivered; and

(5) the fact that Harris was the only employee who did not pick up his paycheck following the theft of the payroll.

Thus Harris' conviction rests entirely upon circumstantial evidence. The basic deficiency I find in the government's evidence is that it fails to include proof of any factual element from which it can be concluded that Harris *knowingly* participated in the robbery and sought by his *actions* to make it succeed. The requisite knowledge can of course be proved by circumstantial evidence, but to do so there must be proof of some fact that fairly tends to prove the *knowledge* with which the acts were done. It is in this area of the inferences or conclusions that can fairly and reasonably be drawn from the foregoing testimonial facts that I part company with the government and the panel opinion. To me the panel opinion relies, as it must because of the absence of adequate connecting evidence, upon too many remote inferences which in turn rest upon too many intervening inferences. In so doing it fails to give adequate weight to the fact that there are other adequate explanations than the ones they arrive at for the conclusions they advance as the basis of decision. In so doing they fail to adequately consider and exclude other reasonable possibilities. I do not contend that they must negate every other reasonable hypothesis except that of guilt but I do contend that the conviction cannot rest, to the extent that it rests here, upon pure speculation and conjecture.

The government is not powerless in these cases. Guilty knowledge and active participation by one who aids and abets the commission of a crime may be proved in many ways.

False statements by the accused could furnish proof of the necessary guilty knowledge, Fox v. United States, 381 F. 2d 125, 129 (9th Cir. 1967); or proof that the alleged accessory *knew* of the principal's criminal record and attempted to cover it up, Costello v. United States, 255 F.2d 389, 400 (8th Cir. 1958); or by proof that the alleged aider must have known of the crime because he shared such large sums of money, Logsdon v. United States, 253 F.2d 12, 14 (6th

Cir. 1958); or that the alleged aider received part of the illegal proceeds from the crime or otherwise indicated by his actions that he was familiar with the details of the crime, King v. United States, 402 F.2d 289, 290–291 (10th Cir. 1968); or that he received funds without the usual formalities or made an arrangement to conceal the transaction, United States v. Daileda, 229 F.Supp. 148 (D. Pa.1964).

All of these cases hold that proof of guilty knowledge is an essential element to a conviction for aiding and abetting. In the words of Learned Hand, it must be proved that the accused have a "purposive attitude" toward the crime. United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938).

A casual examination of the five facts cited by the Government is sufficient to demonstrate that none of them contains any ingredients of evidence that fairly tends to prove the accused with guilty knowledge participated in the crime. None of the five facts are of *acts by the appellant* that aided the crime. Rather, the five facts are chiefly stationary facts, not operative facts connected with the crime.

The record is completely silent as to how the gun and car that were sold to the accused came into the possession of the principals. There is absolutely no evidence that the accused voluntarily loaned them or that if he did that he knew or had any reason to suspect what use they would be put to by the principals. It is just as reasonable to suppose that one or more of the robbers were living with Harris and that they borrowed the car and gun without his knowledge and, if he knew, more importantly without his knowing the use they intended to put them to. Also, the robbers may have had an interest in the car and may have previously purchased the gun. As for the principals being arrested an hour after the crime at an apartment leased to Harris, nothing in that fact carries with it any implication that Harris knowingly and actively participated in the crime. As stated above, some of them may have been living with Harris. The fact that the robbers came there *after* the crime is not probative in any respect of the intent with which Harris committed any act. What is of some adverse significance to the Government's contention is that Harris was not at his apartment an hour after the crime and the trial record is completely devoid of any evidence as to where Harris was at that time. He was not at work, since according to his time card he had punched out at 4:30 (maybe 4:35 actually).[1]

This then brings us to the fourth fact upon which the government attempts to build some inference out of the fact of Harris' employment at the Merkle Press, but the record in this respect is woefully deficient, and the panel opinion now recognizes this to some extent. The Government attempted to establish that only an employee of Merkle Press would know the time and means used to pay off Merkle's employees. But, in offering such testimony into evidence the first question and answer was improper and was stricken and according to the record the United States Attorney did not wait for an answer to his second question.[2] Further, on cross-examination,

1. See p. 94, *infra*, as to time clock being 5 minutes slow.

2. The actual testimony was as follows:
 Q Would anyone other than the employees at Merkle Press, would they have any reason to know about the route by which the payroll is met?
 A No.
 Mr. Docter: Your Honor please, I think he should specify whether he knows. He says no. What is his basis?

 The Court: Do you object to the question?
 Mr. Docter: Yes, sir.
 The Court: In so far as you know. Put your question again.
 By Mr. Finkelstein:
 Q Mr. Quinlan, to your knowledge, would any other person other than an employee of Merkle Press know of the means used by which the payroll is met every Friday at Merkle Press?
 In which department was Thomas Harris employed?

this broad answer was somewhat reduced to more reasonable proportions when the same witness admitted that "only those employees who had observed it * * * [the pattern of the route of getting the money and bringing it over and paying the employees] * * * *would know the pattern.*" There was no evidence that Harris had observed the pattern. He worked in the Shipping Department but his precise duties there and the area in which he worked were not precisely described. Neither was there any evidence that Harris in his employment had the opportunity to know of the payroll pattern, particularly the one that was used on the day of the robbery. It was also admitted that ex-employees might know the pattern, but the government's witness testified he did not know whether close relatives of employees and former employees like husband and wife would know about the pattern. Obviously, they might, and this could be a very large group as the same payroll pattern had been going on since prior to 1957, over ten years prior to the robbery. There was thus a very large group of people who had an equal opportunity with Harris (if he had such opportunity) to know the pattern. So there is nothing in the fourth fact to prove participation with guilty knowledge on the part of Harris.

The fifth and final fact is that Harris was the only one in the Shipping Department who did not pick up his paycheck *after* the robbery. Ordinarily Harris and the other employees were paid by cash, but on this particular day because of the robbery of the cash, they were paid slightly later by check. According to the testimony the robbery was committed at about 4 P.M. and the Shipping Department employees were paid that day by checks "distributed * * * at approximately a quarter after or twenty after four." Harris' time card showed he punched in at 8:01 A.M. and out at 4:30 P.M. The time clock was apparently five minutes slow (Tr. 113) so Harris may have punched out at 4:35 P.M. Whether the time of distribution of the Shipping Department checks was similarly five minutes behind actual time we do not know; but the lack of precise evidence as to how the Shipping Department employees were notified they would be paid by check or as to the proximity of their place of payment to the time clock (where Harris punched out), and as to whether Harris was notified that he could be paid by check or was in the area where he should have learned of such fact, all tend to destroy the effectiveness of this evidence to serve the Government's purpose. The fact that Harris did not pick up his paycheck was not inherently wrongful, it was not related to the robbery in any way and it carried no reasonable inference of knowledgeable participation in the robbery. If Harris had picked up his check it would not have proved that he did not aid the robbery and failing to pick it up does not force a contrary conclusion. At best, it was only a circumstance *after* the crime and is not as incriminating as unexplained flight jointly with a robber which has been held to be insufficient evidence to support a finding of guilty knowledge in aiding and abetting.[3] I suppose the government contends the check incident shows a consciousness of guilt but I submit that conclusion is too remote. To the extent that the payroll circumstance arguably indicates anything with respect

A He was employed in the Shipping Department.

The transcript thus does not support the statement in the Government brief that:

No one other than employees of Merkle Press would have reason to know the system used to pay the employees or the routes traveled to deliver the pay to the various departments. (Tr. 105–106). * * *

3. Bailey v. United States, 135 U.S.App. D.C. 95, 416 F.2d 1110 (1969); and see Scott v. United States, 98 U.S.App. D.C. 105, 232 F.2d 362 (1956) for a case where evidence that accused served as lookout was insufficient to prove aiding and abetting.

to Harris' association with the crime, it could equally be explained by the fact that Harris might have been upset by seeing people he knew rob the payroll (if he saw them), or by the fact that he did not receive notice that they were going to pay by check. But he was not at his apartment an hour later when the principals were arrested and this circumstance cannot be ignored. So without more precise testimony the payroll circumstance cannot be said to be probative of the fact that must be proved that Harris knowingly participated in the robbery.

None of these five facts have any ingredient implicit in their circumstances that fairly tends to prove that Harris had a "purposive attitude" [4] to associate himself with the crime, participate in it as something he wished to bring about and seek by his *action* to make it succeed.[5] To reach such conclusion would involve first assuming from the proven fact that the principals had Harris' car and gun, that Harris *voluntarily* loaned them to the principals and the further assumption that he *knew* they were going to be used to rob the payroll at his place of employment. On this record, such findings would be pure conjecture, as such conclusions as to intent are too remote from proven facts which are not probative of intent.[6] An excellent analysis of the evidentiary limitations of circumstantial evidence is set forth in Part I of Judge Robb's dissent in United States v. Johnson, 139 U.S.App.D.C. 193, 432 F.2d 626 (1970). My own views coincide with his statement of the applicable law but not with its application to the facts of that case. This case is a much more extreme application of the errors he points out there.

When I point out that the circumstantial evidence relied upon by the government had no "ingredient" fairly tending to prove Harris guilty of the offense charged, I mean that there is nothing in the facts that Harris may have owned the car or the gun or have leased the apartment or worked at the plant or failed to pick up his check *after* the robbery that is probative of any *act* committed by Harris. It is all evidence that must rely upon too much inference to furnish a base for a conclusion that Harris *acted* to assist the robbers knowing that they were going to commit a crime. If there had been *any* evidence in connection with *any one* of these five facts that was fairly probative of knowledgeable participation by Harris I would feel differently. Such facts could have been Harris' fingerprints on the license plate that had been removed, a verbal denial by him that he knew the robbers, a false statement that the car or the gun was not his, or any such similar testimony. It would not need to be direct evidence, only circumstantial evidence that in or of itself, without relying completely on inference upon inference, could support a *direct* inference of knowledgeable participation. Failing such test it is my opinion that the evidence does not meet the required standard of persuasion.

Failing to meet such standard, since the five circumstances lack any ingredients to prove that Harris participated with guilty knowledge, they form a wholly inadequate base upon which to rest a

---

4. United States v. Peoni, *supra*, 100 F.2d at 402.

5. Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); Peterson v. United States, 405 F.2d 102 (8th Cir. 1968); White v. United States, 366 F.2d 474 (10th Cir. 1966).

6. Cooper v. United States, 94 U.S.App. D.C. 343, 218 F.2d 39 (1954), reversed a stronger case for aiding and abetting

a robbery. There appellant likewise owned the getaway car and was a friend of one of the robbers. In addition he had asked his cousin in North Carolina to corroborate a false alibi for him. The court held such evidence might raise a question and create suspicion but that is not enough. There is obviously more evidence there than here upon which to base participation with guilty knowledge.

conviction for aiding and abetting.[7] The Government admits as much in its brief, *i. e.*, that when each of these five circumstances is considered separately (fragmented), they are inconclusive of guilt, but they argue that when taken as a whole they are adequate to support the conviction. We agree that the evidence must be considered as a whole. There might be something to the Government's point of cumulating the evidence if the five points were *weak* evidence of participation with guilty knowledge, but they do not go that far. They just have no ingredient in them which tends to fairly prove knowledgeable participation, and I disagree with the Government's thesis that this fatal omission is cured by the fact that it occurs five times. Five times nothing produces nothing. Under such circumstances the government's argument gets down to contending that the *number* of passive circumstances involved warrants a conclusion of guilt, *i. e.*, that it can rely upon the *numerical* probabilities to get over the reasonable doubt hurdle. However, to so base a guilty verdict on numerical probabilities is to base it impermissibly on pure chance. What should be produced from the circumstances is some probability reasonably and fairly based in some fact from which a fair inference of knowledgeable participation can be adduced. As I view the record the factual circumstances do not unerringly point to knowledgeable participation by Harris and a conclusion that they do can be reached only by impermissible speculation and conjecture. Under such circumstances it is my opinion that it would be impossible for a reasonable mind to conclude guilt beyond a reasonable doubt. So, I would reverse and remand with directions to enter a judgment of acquittal on the motion of the defendant.

7. When the Government was asked at oral argument as to which of the five circumstances had any *ingredient* that fairly tended to prove participation with guilty knowledge, they pointed only to No.

4. But as a base for anything, the transcript shows that No. 4 is inadequate for such purpose. See pages 93–95, *supra*.